**Nos. 25-7103, 25-7104, 25-7105, 25-7107 & 25-7108**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

——————————

IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. I) –
MDL NO. 1869

——————————

DONNELLY COMMODITIES INCORPORATED, ON BEHALF OF ITSELF AND ALL OTHERS
SIMILARLY SITUATED; STRATES SHOWS, INC.; OLIN CORPORATION,

*Plaintiffs-Appellants*,

v.

BNSF RAILWAY COMPANY; CSX TRANSPORTATION, INC.; NORFOLK SOUTHERN
RAILWAY COMPANY; UNION PACIFIC RAILROAD COMPANY,

*Defendants-Appellees*,

SOUTHERN COMPANY; DOW CHEMICAL COMPANY; RAYONIER INC.,

*Intervenors-Appellees.*

(*Case captions continued on inside cover*)

——————————

On Appeal from the United States District Court for the District of Columbia,
No. 1:07-mc-00489

——————————

## BRIEF FOR PLAINTIFFS-APPELLANTS

PAUL D. CLEMENT
MATTHEW D. ROWEN
JULIA R. GRANT[*]
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Plaintiffs-Appellants in Nos.
25-7103, 25-7104, 25-7107, 25-7108*

December 12, 2025

25-7104

IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II) –
MDL NO. 2925

AMERICAN HONDA MOTOR CO., INC., et al.,

*Plaintiffs-Appellants*,

v.

UNION PACIFIC RAILROAD COMPANY, et al.,

*Defendants-Appellees*.

25-7105

IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II) –
MDL NO. 2925

LANSING ETHANOL, et al.,

*Plaintiffs-Appellants*,

v.

UNION PACIFIC RAILROAD COMPANY, et al.,

*Defendants-Appellees*.

25-7107

IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II) –
MDL NO. 2925

SUZUKI MOTOR OF AMERICA, INC., et al.,

*Plaintiffs-Appellants*,

v.

UNION PACIFIC RAILROAD COMPANY, et al.,

*Defendants-Appellees*.

25-7108

Oxbow Carbon & Minerals, LLC, et al.,

*Plaintiffs-Appellants*,

v.

Union Pacific Railroad Company, et al.,

*Defendants-Appellees*.

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES,
AND CORPORATE DISCLOSURE STATEMENT**

I represent Plaintiffs-Appellants in D.C. Circuit Case Nos. 25-7103, 25-7104, 25-7107, and 25-7108, the names of which are listed in full in Document #2138177 in Case No. 25-7103, filed on October 1, 2025.  I hereby certify that the combined certificate of parties, rulings, and related cases and corporate disclosure statement filed on September 2, 2025, Document #2133129, remains accurate to date.

s/Paul D. Clement
Paul D. Clement

*Counsel for Plaintiffs-Appellants
in Case Nos. 25-7103, 25-7104,
25-7107, and 25-7108*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iv

GLOSSARY OF ABBREVIATIONS ..................................................... viii

INTRODUCTION .................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 3

STATUTES AND REGULATIONS ......................................................... 4

STATEMENT OF THE ISSUES ............................................................. 4

STATEMENT OF THE CASE.................................................................. 4

I.     Factual Background.................................................................... 4

       A.     Historically, Competition Kept Rail Rates Relatively Low
              and FSCs Trivial.............................................................. 4

       B.     In 2003, Defendants Begin Meeting to Discuss an
              Industrywide Position—and Their Respective Rates Soar ................. 6

II.    Procedural Background .............................................................. 15

SUMMARY OF ARGUMENT................................................................. 19

STANDARD OF REVIEW ..................................................................... 21

ARGUMENT .......................................................................................... 22

I.     The District Court Erred In Granting Summary Judgment .......................... 22

       A.     The Evidence Was More Than Sufficient to Establish a
              Genuine Dispute About Whether Defendants Colluded .................... 22

       B.     The District Court Effectively Required Plaintiffs to Prove
              Their Whole Case Just to Survive Summary Judgment..................... 30

       C.     The District Court Considered Plaintiffs' Evidence Piecemeal
              and Repeatedly Drew Inferences in Defendants' Favor..................... 42

II.    The District Court Erred In Excluding Defendants' Statements That
       Did Not "Concern[] An Interline Movement Of The Rail Carrier" ............. 52

CONCLUSION ................................................................................................. 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Tolbert,*
    636 F.3d 622 (D.C. Cir. 2011)........................................................................21

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................... 21, 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................23

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)............................................................................... 26, 36

*Calvi v. Knox Cnty.*,
    470 F.3d 422 (1st Cir. 2006) ........................................................................31

*Catalano, Inc. v. Target Sales, Inc.*,
    446 U.S. 643 (1980)......................................................................................22

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).......................................................................................16

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)............................................................................... 43, 46

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984)......................................................................................23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)................................................................ 20, 22, 35, 36

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
    663 F.2d 253 (D.C. Cir. 1981) ............................................................ 30, 34, 35

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3rd Cir. 1999).......................................................................32

*In re Coordinated Pretrial Procs. in Petroleum Prods. Antitrust Litig.*,
    906 F.2d 432 (9th Cir. 1990).......................................................................34

*In re Flat Glass Antitrust Litig.,*
　　385 F.3d 350 (3d Cir. 2004) ............................................................ 33, 37, 46, 48

*In re High Fructose Corn Syrup Antitrust Litig.,*
　　295 F.3d 651 (7th Cir. 2002) .................................................................. 41, 43, 45

*In re Polyurethane Foam Antitrust Litig.,*
　　152 F.Supp.3d 968 (N.D. Ohio 2015) ....................................................................34

*In re Publ'n Paper Antitrust Litig.,*
　　690 F.3d 51 (2d Cir. 2012) .......................................................................... 26, 31

*In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II),*
　　2020 WL 5016922 (D.D.C. Aug. 25, 2020) ..........................................................17

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
　　725 F.3d 244 (D.C. Cir. 2013) ..............................................................................16

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
　　934 F.3d 619 (D.C. Cir. 2019) ..............................................................................16

*In re Text Messaging Antitrust Litig.,*
　　782 F.3d 867 (7th Cir. 2015) ................................................................................32

*In re Urethane Antitrust Litig.,*
　　768 F.3d 1245 (10th Cir. 2014) ..................................................................... 38, 39

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
　　34 F.4th 1 (D.C. Cir. 2022) .......................................................... 5, 17, 18, 52-56

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
　　475 U.S. 574 (1986) ............................................... 19, 23, 34, 36, 37, 42

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
　　465 U.S. 752 (1984) ........................................................................... 23, 34

*Muldrow ex rel. Est. of Muldrow v. Re-Direct, Inc.,*
　　493 F.3d 160 (D.C. Cir. 2007) ..............................................................................57

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.,*
　　81 F.Supp.3d 1 (D.D.C. 2015) ..............................................................................15

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*,
    998 F.2d 1224 (3d Cir. 1993) ....................................................... 37, 46

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir. 1998) .............................................................30

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ...........................................................42

*Texas v. Allan Constr. Co.*,
    851 F.2d 1526 (5th Cir. 1988) ..........................................................23

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
    346 U.S. 537 (1954) ..........................................................................23

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*,
    496 F.3d 403 (5th Cir. 2007) ...........................................................23

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
    608 F.3d 871 (D.C. Cir. 2010) .........................................................22

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ................................................................... 22, 39

**Statutes**

15 U.S.C. §1 ............................................................................... 4, 22

28 U.S.C. §1291 ................................................................................4

28 U.S.C. §1331 ................................................................................3

28 U.S.C. §1337 ................................................................................3

49 U.S.C. §10706 ..................................................... 3, 4, 17, 21, 52

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp,
    *Antitrust Law* (4th ed. 2023) ..........................................................27

Herbert Hovenkamp, *The Rationalization of Antitrust*,
    116 Harv. L. Rev. 917 (2003) ..........................................................36

*Rail Fuel Surcharges, No. 661*,
2007 WL 201205 (S.T.B. Jan. 25, 2007) ...................................................... 14, 29

# GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| BNSF Railway Company | BNSF |
| CSX Transportation, Inc. | CSX |
| Norfolk Southern Railway Company | NS |
| Union Pacific Railroad Company | UP |
| fuel surcharge | FSC |
| Association of American Railroads | AAR |
| Network Efficiency Management Committee | NEMC |
| Rail Cost Adjustment Factor | RCAF |
| All-Inclusive Index Less Fuel | AII-LF |
| Surface Transportation Board | STB |

**INTRODUCTION**

This case involves price-fixing, pure and simple.  Plaintiffs compiled a legion of evidence showing that the nation's four largest railroads conspired to fix prices at supracompetitive rates and thereby reaped unprecedented returns.  Their path to price-fixing was through a pricing term that had proven impotent under competitive conditions:  the rail fuel surcharge, or "FSC."  But once collusion began in 2003, that previously trivial add-on supercharged Defendants' bottom lines.

Before the conspiracy, Defendants struggled to make even modest FSCs stick.  Competition meant that shippers (railroads' customers) could often negotiate away such surcharges even when they were a relative pittance.  But everything changed in 2003.  Defendants' senior executives began to meet with unprecedented frequency— and they explicitly discussed FSCs and industry price-standardization.  In the wake of these unprecedented get-togethers among should-be competitors, each Defendant made its FSCs far more aggressive and made changes to its fuel-surcharge program to ensure that FSCs finally would stick.  As a result of their cooperation, Defendants reaped enormous sums, far outstripping any rise in fuel costs—an incongruous result Defendants celebrated internally but disclaimed publicly.

A reasonable jury confronted with this record could readily find that this sudden conversion of FSCs from insignificance to profit-centers was a product of collusion.  In fact, earlier in this litigation, which he oversaw for more than a decade,

Judge Paul Friedman found that Plaintiffs adduced "strong evidence of conspiracy." Dkt.853.at.2.[1]  As Judge Friedman concluded, "the fuel surcharge programs applied before the [conspiracy] period were nothing like the widespread and uniform application of standardized fuel surcharges during [that] period," which were "of a different breed."  Dkt.550.at.86,87.  But after the litigation was transferred to Judge Beryl Howell, she reached the opposite conclusion, holding—based on essentially the same record—that no rational jury could follow Judge Friedman's example and find a conspiracy.  Those differing conclusions based on the same record confirm that the decision below cannot stand, and that a jury should decide whether it was collusion or coincidence that Defendants discussed FSCs and price-standardization in unprecedented meetings, and then uniformly applied and enforced FSCs for the first time, making them billions of dollars in excess of the actual cost of fuel.

The decision below taking that question away from the jury fundamentally misconceived the governing law.  The court wrongly assigned Plaintiffs the burden of *dis*proving the possibility of innocent conscious parallelism.  According to Judge Howell, to survive summary judgment, antitrust plaintiffs must "make the inference of a conspiracy more 'attractive' [to the court] than the alternative inference of independent action."  Dkt.1267 ("Op.") at 35.  That is not the law.

---

[1] Except where indicated, "Dkt." citations refer to No. 1:07-mc-489, the master district court docket.

Making matters worse, the district court routinely resolved factual disputes, deciding for itself which side's inferences from the evidence were (in the court's words) more "attractive." The court also misapplied Rule 56 via a divide-and-conquer technique that ignored the overwhelming evidence that Defendants' sudden change of fortune was not a result of mere happenstance. The result was an improper usurpation of the jury's role. By isolating and downplaying powerful evidence of collusion, the court not only missed the forest for the trees, but ignored clear precedent demanding a holistic analysis that preserves the jury's province and ensures that per se antitrust violations do not go unremedied.

Finally, although the summary-judgment record was more than robust enough to defeat Defendants' motion, it should have been better still. The district court erred in excluding or redacting numerous documents (in advance of summary judgment) that do not fall within the narrow exclusion rule for interline communications set forth in 49 U.S.C. §10706.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331 and 1337. The court granted summary judgment on that claim on June 24, 2025, and issued final judgment the same day. Dkts.1264,1267. Plaintiffs timely filed notices of appeal

on July 22 and 24, 2025.  Dkt.1269; No. 11-cv-1049 (D.D.C.), Dkt.394.  This Court

has jurisdiction under 28 U.S.C. §1291.

## STATUTES AND REGULATIONS

15 U.S.C. §1 and 49 U.S.C. §10706 are reproduced in an addendum

accompanying this brief.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in granting summary judgment to

Defendants on the issue of concerted action.

2.      Whether the district court erred in excluding evidence under 49 U.S.C.

§10706 that does not "concern[] an interline movement of the rail carrier."

## STATEMENT OF THE CASE

**I.      Factual Background**

**A.      Historically, Competition Kept Rail Rates Relatively Low and FSCs Trivial.**

The railroad industry is heavily concentrated.  During the relevant period,

CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"),

BNSF Railway Company ("BNSF"), and Union Pacific Railroad Company ("UP")

together accounted for nearly 94% of domestic freight revenue.  Dkt.1229-1

("COF") ¶¶1,8-12.  While those four railroads were remarkably successful vis-à-vis

smaller carriers, their competition with one another squeezed their respective bottom

lines. Before 2003—when everything changed—they faced a steady, decades-long decline in rates. JA___[PX595.at.85-87]; JA___[PX205.at.149]; *see also* COF¶16.

One mechanism that had the potential to drive up rates—but only if everyone agreed to make them stick—was the rail fuel surcharge. Railroads set base rates that recoup their costs and return a profit. For long-term contracts, railroads and shippers may negotiate base-rate adjusters, such as the Rail Cost Adjustment Factor ("RCAF"), a published index that accounts for changes over time in input costs like labor, equipment, and fuel. COF¶374. Rail fuel surcharges, or "FSCs," are add-on charges that railroads sought to impose, ostensibly in response to rising fuel costs.

FSCs can be either "rate-based," which calculates the surcharge "as a function of the base rate," or "[m]ileage-based," which "raise[s] total rates in proportion to shipping distances." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 34 F.4th 1, 6-7 (D.C. Cir. 2022). A rate-based FSC provides that when the price of oil or diesel exceeds a "trigger" or "strike" price, an escalating surcharge will apply as a percentage of the base rate. For instance, a railroad might levy a 2% surcharge on base rates when the price of oil reaches $23 per barrel and then increase the surcharge by another 0.4% for every additional dollar the price of oil increases. Op.9. But regardless of the details, FSCs at root are upcharges, which no customer wants to pay—and sophisticated customers will negotiate away if they can.

For years, Defendants individually tried to impose FSCs, but competition kept getting in the way. Shippers routinely refused FSC terms, and those they accepted were relatively low and rarely triggered. COF¶¶29-32,46-77,48,62,65,67,70,73-74,238,240,255-59. Even when surcharges *were* triggered under the *ancien régime*, shippers often avoided paying them by threatening to take their business elsewhere, and Defendants empowered front-line, lower-level personnel to waive or discount the FSCs to keep shippers' business—which was commonplace. COF¶¶29-32,46-77,48,53,62,65,67,70,73-74,238,240. Thus, pre-2003, FSCs were only "minimal[ly]" invoked in "isolated" situations. COF¶¶50,57,62,65,72,76,238.

Defendants contemporaneously acknowledged this reality. *E.g.*, JA___[PX219]; JA___[PX88]; JA___[PX614.at.18-19]. Before the conspiracy period, then, customers were largely calling the shots on FSCs—and could usually convince Defendants to waive them, lest customers object with their feet. *See, e.g.*, JA___[PX614.at.26] (NS describing pre-2003 FSCs as only "theoretically billable"); *see also* COF¶¶50,57-58,62,65-66,72,74,76.

### B. In 2003, Defendants Begin Meeting to Discuss an Industrywide Position—and Their Respective Rates Soar.

As BNSF bemoaned in 2002, "competition" was the reason for its "not being able to improve revenue through adequate rate increase[s]." JA___[PX127.at.103]. The company stressed that it "need[ed] to be able to achieve price rate improvement. *How can we do this if the other competing railroads do not do this at the same time?*

6

We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy." JA___[PX127.at.103] (emphasis added). In short, after years of declining profits, Defendants realized that, to ensure "rate adequacy," they needed to work together.

As Defendants admitted in sworn interrogatories, before 2003, their respective senior executives *never* discussed FSCs with one another. COF¶¶93-94; *see also* COF¶¶22-23. That makes sense. Even apart from the obvious antitrust concerns with such high-level discussions among competitors about price, FSC decisions had always been handled by lower-level personnel "in the depths of" Defendants' "organization[s]," not by senior management. COF¶41. But spring 2003 saw a marked shift. Suddenly, communication among the highest levels of the four companies was pervasive—and often involved discussion and sharing of competitively sensitive price information.

These novel meetings were conducted in defiance of Defendants' (and their trade association's) policies regarding antitrust compliance. *E.g.*, JA___[PX725.at.473]; JA___[PX604.at.88]. That likely explains why Defendants did not institute protocols to record or transcribe their meetings accurately. *E.g.*, JA___[PX631.at.157-58,224-25,227-28]. It also provided convenient cover for the collective amnesia of eight different senior executives across the four Defendants, who all testified to difficulty in recalling *any* of what was discussed in *any* of these

meetings.  JA___[PX630.at.226];  JA___[PX631.at.124];  JA___[PX596.at.267];

JA___[PX612.at.141];  JA___[PX595.at.253-56];  JA___[PX616.at.230-32];

JA___[PX604.at.130]; JA___[PX629.at.216]; *see also* COF¶¶154,185,193.

Some handwritten notes and unpolished minutes did survive, though—and
their import is unmistakable:  Throughout 2003, Defendants openly discussed ways
to make their fuel-surcharge formulas more similar to one another's; to make them
kick in at lower fuel prices; to impose them on all business lines; and to eliminate
collection exceptions that destabilized their efforts to make FSCs stick.  In other
words, they met to figure out how to fix prices—and then acted on their agreement.

- **March 12-13:** CSX and UP senior executives meet to discuss FSCs.[2]
  The day before the meeting, each company analyzed FSCs internally;
  UP, for instance, considered sharpening its FSC, increasing its
  escalator to 0.4% per $1/barrel.  COF¶¶107-10.

- **March 20:** After the meeting with UP, CSX announces a new FSC
  that tracks the one UP had considered internally:  CSX will lower its
  strike price, remove a safeguard excluding short-term oil spikes from
  FSCs, and increase its escalator to 0.4% per $1/barrel—the very same
  escalator UP was considering internally, but which CSX had never
  previously analyzed.  COF¶¶110-21.

- **March 21:** CSX orders an internal review of all contracts to determine
  how to convert them to the new FSC regime.  COF¶338.

---

[2] Although the district court erroneously excluded documentary evidence
(namely, PX202) showing that CSX and UP executives discussed FSCs in person on
these dates, *see* Part II, *infra*, CSX and UP each admitted via interrogatory that their
longstanding practice of refraining from discussing FSCs with competitors'
executives ended on March 13, 2003, COF¶94.

- **April 1:** Following a **March 18** meeting between NS senior executive Don Seale and BNSF senior executive John Lanigan at which they discuss "synchroniz[ing]" BNSF's fuel surcharge "with the other big players in the industry," i.e., "NS, CSX, and UP"), JA___[PX145][3], NS executive reports internally that UP would match CSX's surcharge and speaks privately with CSX about its plans, COF¶¶132-36.

- **April 2-6:** Senior executives from all Defendants attend the National Freight Transportation Association ("NFTA") meeting.  COF¶151.

- **April 4:** During the NFTA meeting, UP announces it will adopt CSX's new FSC—even though UP's team had never modeled combining the CSX strike-price change with the escalator change UP had considered. COF¶¶122-24.

- **April 9:** BNSF's Lanigan—who discussed synchronizing FSCs with NS's Seale—internally directs that, "immediately and urgently," he will assume sole authority to waive FSCs.  COF¶¶148,156-57.

- **April 15-17:** Defendants attend an executives-only getaway. JA__[PX356.at.220].  On the retreat's first day, NS's Seale asks his team to make a recommendation in three weeks on whether to change FSCs; on the retreat's last day, he changes course, telling a colleague that NS's FSC would change—which NS did over the following months.  COF¶¶137-40,209-10.

- **April 30:** Marketing executives from all four railroads gather at an Association of American Railroads ("AAR") meeting.  COF¶160. The same day, NS declares internally that any FSC exceptions will need to be approved by Seale, who attended the meeting, COF¶165, and BNSF changes its FSC to match UP and CSX, abandoning a months-long internal analysis of whether to adopt a mileage-based FSC better tied to actual fuel costs, COF¶¶141-50,159-61.

- **May 12:** NS's Seale learns BNSF was still discounting its FSC—and makes a plan for "a stable approach" for the "industry" that he will raise in a "conversation with UP this week."  JA___[PX303.at.321].

---

[3] Portions of PX145 were erroneously redacted.  *See* Part II, *infra*.

- **May 14:** NS-UP meeting at which senior executives, including NS's Seale and UP's chief commercial officer Jack Koraleski, reach a "consensus" on "fuel surcharges." JA___[PX241.at.361]; *see also* JA___[PX460.at.652] ("Uniform application across the industry would be helpful[.]").

- **June 3:** CSX and UP executives meet and "discuss customer reaction" to their "current processes" for "[f]uel [s]urcharges." JA___[PX167.at.417]. They acknowledge both their surcharges "start at a $23 trigger" and may need to be "revisit[ed]" if oil prices "stay high." JA___[PX474.at.423].

- **June 23:** All Defendants' CEOs hold an off-the-books meeting at Chicago Midway. JA___[PX534.at.514]. No notes survive.

- **July 30:** Seale (NS) and Lanigan (BNSF) meet to discuss a "potential industry position" on FSCs, which they plan to raise "at the next [Network Efficiency Management Committee ('NEMC')] meeting." JA___[PX243.at.422,424].

- **August 12:** All Defendants' CEOs meet at New York's Palace Hotel. JA___[PX25.at.136]. No notes survive.

- **September 11:** Defendants attend the NEMC conference, after which NS's Seale emails BNSF's Lanigan that NS would "work with … BNSF to advance each of the identified projects and action items" agreed to in July. JA___[PX244].

- **September 12:** All Defendants' CEOs hold a call under the auspices of AAR. JA___[PX457].

Alongside these unprecedented meetings in 2003, Defendants started charging more and making FSCs stick. As Judge Friedman explained, "the fuel surcharge programs applied by the defendants before the class period were nothing like the widespread application of defendants' more aggressive, standardized fuel surcharge programs during the class period," which were ruthlessly "applied uniformly" across

all business lines. Dkt.550.at.41. Hefty and durable FSCs suddenly became the prevailing model. COF¶314. Revenues skyrocketed: Over five years, FSCs went from a theoretical add-on worth virtually nothing to accounting for *more than 20%* of Defendants' multibillion-dollar revenues. COF¶517.

That transformation of FSCs from an oft-waived triviality into a massive revenue-driver is readily—though not lawfully—explained: Defendants sought to make FSCs an industrywide default that shippers would have to accept, which they accomplished by making FSCs functionally non-negotiable and applying them to as much of their traffic as possible. By the end of 2003, each Defendant had eliminated low-level waivers and adopted strict policies empowering only senior management to grant exemptions. JA___[PX50]; JA___[PX170]; JA___[PX181]; JA___[PX193]; JA___[PX270]; JA___[PX1111]; *see also* COF¶¶325,331,352,360.

With these changes, Defendants transformed FSCs from paper tigers to actual beasts. Across the board, FSCs became "non-negotiable," Dkt.550.at.92, and surcharge-imposition rates soared. JA___[PX97] (BNSF's forecasted surcharge-imposition rate rose from 38% to 89%, including from 42% to 98% in consumer shipments); JA___[PX300] (NS's rose to 85% by Q4 2005); JA___[PX217] (CSX's rose from 41% in 2004 to 54% in 2006, and was projected to hit 85% by 2011); JA___[PX413]; JA___[PX393]; JA___[PX505] (UP's rose from 42% in 8/2003 to

11

85% in 3/2007); *see also* COF¶¶240,248,270,328,332-39,349-54,363; JA___[PX770.¶155].[4]

The relevant changes occurred over the course of 2003, and it took a handful of iterations to ensure the new FSCs were not only more widely imposed, but also (far) more aggressive. *See* COF¶¶105-07,111,117,122,151-52,160,165. But by early 2004, all Defendants adopted supercharged FSC formulas. JA___[PX185]; JA___[PX347]; JA___[PX84]; JA___[PX784]; JA___[PX401]. These formulas boasted lower strike prices (so even moderate fuel prices would trigger FSCs), included more aggressive escalators (so revenue margins increased as fuel prices increased), and eliminated the prior rule limiting FSCs to sustained periods of high fuel costs. JA___[PX163]; JA___[PX141]; JA___[PX401]; JA___[PX347]; *see* COF¶¶118-19,161,224. These changes made it all-but certain customers would pay

---

[4] The 2003 FSC-imposition rates may look material, but those figures are deceiving. Even when FSCs were in contracts pre-2003, the shippers often negotiated discounts in the form of rebates. *See, e.g.*, JA___[PX216]. Defendants also routinely waived surcharge balances or agreed to cap FSC amounts due. *E.g.*, JA___[PX223]; JA___[PX200]; JA___[PX488]; JA___[PX772]. That explains why, even if some portion of traffic was covered pre-2003, Defendants themselves did not see the FSCs as meaningful sources of revenue before the conspiracy. *See, e.g.*, JA___[PX612.at.226] (CSX executives testifying that the FSCs were applied "minimal[ly]" before the conspiracy period and that they were "embarrassed" by how rarely FSCs were imposed.); JA___[PX621]; JA___[PX610].

surcharges more often—and in higher amounts.  JA___[PX163]; JA___[PX473]; JA___[PX401]; JA___[PX235]; *see* COF¶¶117,122-23,158,223.[5]

Defendants recognized that the newly implemented formulas represented "a large increase in fuel surcharge billings—maybe as much as 100%"—and were "definitely … more aggressive" than before.  JA___[PX163]; JA___[PX614.at.42]; *see also* JA___[PX110] (BNSF executive recognizing that the new FSCs "make money.  Big money.").  The evidence bore that out.  While "average FSC rates pre-conspiracy period were 1.2%" for UP, NS, and CSX, and "1.6%" for BNSF, "during the alleged conspiracy period," those figures were "13.4% for BNSF and UP" and "16.3% for CSX and NS."  Op.45; *see also* JA___[PX770.¶156]; COF¶¶511,535,553,536,541,546.  Defendants thus succeeded not just in getting more customers to pay FSCs; they succeeded in getting almost all their customers to pay immensely more expensive FSCs.

These massive increases cannot be explained away as a formulaic result of rising fuel costs.  The new FSCs bore no relationship to the actual costs of fuel.  And, regardless, any defense focused on supposedly rising fuel costs—in addition to being an issue for the jury—has a significant chronology problem:  When Defendants changed their FSC programs, fuel costs were "generally low and flat" and "actually

---

[5] In 2004, the two western Defendants (BNSF and UP) increased their FSCs for coal traffic too.  JA___[DA15709-13]; JA___[DA1625-26]; *see* COF¶¶282-94.

expected to fall"—as Defendants admitted. JA___[PX648.¶¶61,148]; JA___[PX776.¶77]; *see also* JA___[PX270.at.522] (NS recognizing in 4/2003 that "[f]uel costs are dropping" and "we may be entering an extended period of reasonable oil costs"). Defendants changed their respective FSC programs at the same time and in similar ways to collect more money *not* in the face of rising fuel costs, but when fuel costs were flat—and then when fuel costs eventually did rise, Defendants reaped unprecedented, supracompetitive profits.

Defendants tried to hide this. Despite publicly describing the new, aggressive FSCs as mere cost-recovery mechanisms, COF¶¶446,456,465,468-69, Defendants recognized internally that they went well beyond cost-recovery, *e.g.*, JA___[PX93]; JA___[PX297]; *see* COF¶¶450,457-58,460-63,466,470-72. So did the Surface Transportation Board ("STB"), which found Defendants' new FSCs could not be "fairly … described as merely a cost recovery mechanism," as they had "virtually no prospect of reflecting the actual increase in fuel costs." *Rail Fuel Surcharges, No. 661*, 2007 WL 201205, at *4 (S.T.B. Jan. 25, 2007). STB condemned the new FSCs as "misleading and ultimately unreasonable," shrouded in "pretext" and "misrepresentation" to conceal "a broader revenue enhancement measure," *id.* at *4-5—an outcome achievable only by collusion.

## II.    Procedural Background

This litigation's history spans two district judges and nearly two decades. The first round occurred immediately following STB's 2007 decision, when 18 separate class actions were filed against Defendants. The cases were consolidated as *MDL I* and assigned to Judge Friedman. Dkt.138. The putative class claims survived motions to dismiss. Dkts.138;175. In 2011, another suit alleging price-fixing was filed, this one against only UP and BNSF. That case ("*Oxbow*") was sent to Judge Friedman as related; those claims survived motions to dismiss too. *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 81 F.Supp.3d 1 (D.D.C. 2015).

On first pass, Judge Friedman granted class certification. Dkt.550.at.116-36. Judge Friedman scrutinized the record, concluding "by a preponderance of the evidence that the fuel surcharge programs applied before the class period were nothing like the widespread and uniform application of standardized fuel surcharges during the class period." Dkt.550.at.86. As Judge Friedman explained, whereas "defendants' differentiated fuel surcharges" pre-2003 "were subject to competition and negotiation with shippers, were less aggressive, and applied only sporadically," "[t]he fuel surcharges that defendants put in place in the spring of 2003 were of a different breed." Dkt.550.at.87. Judge Friedman stressed that "[t]he evidence shows that defendants employed these fuel surcharges in lockstep," "they were more aggressive and yielded more revenue than earlier programs," and they were "non-

negotiable" and "standardized and uniformly applied across all or virtually all shippers." Dkt.550.at.87-88,92. Indeed, while Defendants relied on declarations submitted by their executives purportedly showing that Plaintiffs' copious "evidence of aggressive, uniform, and standardized fuel surcharges is not reflective of reality," Judge Friedman found these declarations "unpersuasive," as they were "contradicted" by "subsequent deposition testimony." Dkt.550.at.89.

On appeal, this Court, too, recognized that surcharges "proliferated and intensified" starting in 2003, when they suddenly "became ubiquitous"—and that, "[a]t the same time, the defendants sharpened the surcharges' sting." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 247-48 (D.C. Cir. 2013). But it remanded for Judge Friedman to look at class certification anew given intervening precedent. *Id.* at 253-55 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)).

On remand, Judge Friedman concluded that, under *Comcast*, individualized questions about injury would predominate. Dkt.853.at.19-20,107-09,173-81. But he took pains to stress that his view of the "extensive factual record" "ha[d] not changed": Plaintiffs' "documentary evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges in the class period" remained "substantial." Dkt.853.at.128,166; *see also* Dkt.853.at.131.

That denial of class-certification, which this Court affirmed, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019), precipitated the filing

of a bevy of individual suits alleging the same price-fixing scheme. These individual actions—filed by some of the largest corporations in America, including multiple Fortune 100 companies—were consolidated as *MDL II* and assigned to Judge Howell. As in *MDL I*, most claims survived motions to dismiss. *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*, 2020 WL 5016922 (D.D.C. Aug. 25, 2020).

In 2020, Defendants moved to exclude certain documents under 49 U.S.C. §10706(a)(3)(B)(ii)(II), which, while providing no immunity, generally bars the admission of evidence "concern[ing] an interline movement of [a] rail carrier" in antitrust cases. "[I]nterline movements are shipments carried along two or more railroads' tracks under a common arrangement"; in contrast, "single-line shipments are moved by one carrier on its own tracks." 34 F.4th at 6.

The district court initially held that a discussion or agreement "concern[s] an interline movement of the rail carrier" only if it is about "an identifiable movement or movements with identifiable circumstances, such as a specific shipper, specific shipments, and specific destinations," and "all of the parties to the discussion or agreement participate in the interline movement or movements that are the subject of the discussion or agreement." Dkt.1008.at.40-43. Based on that understanding, the district court denied the motion. Dkt.1008.at.49. This Court vacated and remanded, however, holding that a "brief and insignificant[] reference to non-interline traffic does not automatically disqualify evidence from exclusion under

10706." 34 F.4th at 9-10. On remand, while the parties narrowed the scope of the dispute, some disagreement remained, so the district court reviewed each document in contention. The court ultimately granted in part and denied in part Defendants' motion, excluding documents and redacting segments it found focused on discussions about "the carriers' shared interline traffic." Dkt.1123.

In March 2024, *MDL I* and *Oxbow* were transferred to Judge Howell. Defendants then sought summary judgment in all three cases on essentially the same record that was before Judge Friedman at class certification.

The court granted Defendants' motion, concluding that no reasonable jury could find Defendants engaged in concerted action. Starting with a finding that "defendants did not take parallel action during the alleged conspiracy period," as their "formulas prior to the start of the alleged conspiracy period were more uniform than their formulas after defendants made changes in 2003," Op.44, the court concluded that Plaintiffs did not "provide[] evidence tending to exclude the possibility of independent action or indicating that an inference of an agreement is more plausible than that of unilateral decision-making," Op.37. In the court's view, the "timing of defendants' changes d[id] not allow for a finding of parallel conduct." Op.53. And even if there were parallel conduct, the court held it would not matter, deeming Defendants' conduct "more consistent with conscious parallelism than the existence of an unlawful agreement," given (supposedly) "[r]ising input costs."

Op.69-71.  The court further concluded that Plaintiffs' plus-factor evidence did not raise an inference of collusion.  Finally, after disaggregating that evidence into "nine somewhat overlapping categories," "evaluat[ing] [each] piecemeal," Op.95,149—and concluding in each instance that the (siloed) evidence was "more consistent with normal competitive conduct than conspiracy," Op.125,144; *see also* Op.104,105,121,126,131,139,146,148—the court fleetingly rehashed the evidence for a supposedly "holistic" review and announced that the record was "at least as consistent with … independent conduct than a conspiracy," Op.150,152.

## SUMMARY OF ARGUMENT

Review here is de novo and should lead to reversal.  Though tasked with deciding whether there was enough evidence of collusion to permit the jury to weigh evidence and make credibility determinations, the court saw its role differently.  It decided to weigh the "attractive[ness]" of the evidence for itself, requiring Plaintiffs to disprove the possibility that independent conduct—rather than unprecedented meetings followed by unprecedented discipline—explained the transformation of surcharges from trivialities into profit-centers.  That was plainly an overstep that misread precedent and invaded the province of the jury.

The errors started with a misconstruction of the Supreme Court's decision in *Matsushita Electric Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  According to Judge Howell, Plaintiffs had to do more than present evidence that

"tends to exclude" innocent explanations; Plaintiffs had to *disprove* a starting presumption that Defendants' conduct was benign. Worse still, Judge Howell intruded into the province of the jury by making factual and credibility determinations in Defendants' favor, ignoring contrary evidence and competing inferences (not to mention Judge Friedman's findings). At bottom, the decision below disregarded one of the principal lessons of *Matsushita* and the Supreme Court's subsequent decision in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992): Summary-judgment courts draw inferences in the non-movants' favor, so long as their theory is economically plausible. In nonetheless refusing to draw *any* inferences in favor of Plaintiffs, who presented an intuitive theory of collusion in a highly concentrated market backed by a legion of evidence of unprecedented meetings and discipline in making surcharges stick, the district court violated bedrock summary-judgment and antitrust principles.

Despite paying lip-service to viewing Plaintiffs' evidence holistically, the district court's brief foray into "holistic" analysis followed dozens of pages of divide-and-conquer dismissal of powerful evidence of collusion. The court also fixated on decimal points in Defendants' respective FSC formulas, deeming razor-thin differences proof of independent conduct. But slight variations are to be expected with any conspiracy hoping to avoid detection—especially in an industry with complex pricing mechanisms and thousands of customers—and it is error to

focus on minor differences while ignoring the critical agreement to make surcharges stick. Taken together, these errors resulted in an opinion unmoored from black-letter law that wrested a strong case of price-fixing from the jury.

That is not all. Before summary-judgment proceedings, the district court erroneously excluded additional evidence of collusion based on a misreading of this Court's opinion interpreting 49 U.S.C. §10706. To be clear, the decision below granting summary judgment to Defendants is unsustainable with or without the improperly excluded evidence; but with it, the enormity of the injustice is manifest.

Defendants reaped what competitive forces had long denied them, at the direct expense of Plaintiffs. Virtually any jury would see that. It was reversible error to deny the jury that opportunity. And this Court should reverse the §10706 exclusions, too, to ensure that the jury will have the benefit of the full picture the law allows.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment de novo. *Ali v. Tolbert,* 636 F.3d 622, 627-28 (D.C. Cir. 2011). Summary judgment is appropriate only when the movant conclusively shows that, drawing all reasonable inferences against it, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.* A genuine issue of material fact exists if a reasonable jury could find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). While courts demand evidence that makes it reasonable to infer concerted action and

"tends to exclude the possibility" of independent action, *Matsushita*, 475 U.S. at 588, there is no antitrust exception to the Rule 56, and no "special burden on plaintiffs facing summary judgment in antitrust cases," *Kodak*, 504 U.S. at 468.

This Court "review[s] for abuse of discretion the district court's decisions to admit evidence," but "to the extent [Plaintiffs] argue the district court misinterpreted [§10706]," it "review[s] those interpretations *de novo*." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 891 (D.C. Cir. 2010) (per curiam).

## ARGUMENT

## I.    The District Court Erred In Granting Summary Judgment.

### A.    The Evidence Was More Than Sufficient to Establish a Genuine Dispute About Whether Defendants Colluded.

1. The Sherman Act prohibits any "combination" or "conspiracy" that unreasonably restrains trade.  15 U.S.C. §1.  While most such combinations are judged under the rule of reason, price-fixing conspiracies are per se illegal "because of their actual or potential threat to the central nervous system of the economy." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).  Indeed, even an agreement on just one aspect of price, such an "agreement to eliminate discounts"—the flipside of an agreement to impose surcharges—is per se unlawful. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) (per curiam).  Proving that competitors agreed to fix some aspect of prices thus suffices to establish a §1 violation.

"A necessary ingredient of any section 1 conspiracy is a showing of concerted action on the part of the defendants." *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007). Concerted action "deprives the marketplace of the independent centers of decision-making that competition assumes and demands." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984). The "crucial question" in a §1 case, then, "is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).

Because most conspiracies "must remain concealed to be successful," *direct* evidence of concerted action rarely exists. *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1531 (5th Cir. 1988). Thus, to get before a jury, §1 plaintiffs need only adduce evidence that, if viewed in the most favorable light, "reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *see also Matsushita*, 475 U.S. at 586-88 (clarifying that the operative question is whether "the inference of conspiracy is reasonable"). In short, "summary judgment will not lie" for an antitrust defendant (as with any other defendant) "if the evidence is such that a reasonable jury *could* return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (emphasis added).

2. The evidence here cleared that bar—with room to spare. First, as detailed above, *see* pp.7-10, *supra*, Plaintiffs presented copious evidence showing that, starting in early 2003, Defendants' senior executives discussed industry-standardization of FSCs and shared competitively sensitive information to facilitate that effort. *See, e.g.*, JA___[PX202] (UP and CSX executives meet, discuss "[f]uel surcharge methodology"); JA___[PX145] (NS and BNSF executives meet, discuss "synchroniz[ation]" of BNSF's FSC "with the other big players in the industry," i.e., "NS, CSX, and UP"); JA___[PX244] (NS's Seale informed BNSF's Lanigan that NS would "work with … BNSF to advance each of the identified projects and action items," including FSC industry-standardization); ██████████████████

████████████████████████████████████████████████████████████

COF¶¶95,139,145,146,151,154,159,160,182,190-201,203,204,268-73,502-04.

These meetings were unprecedented: Defendants' senior executives never previously discussed the details of their FSCs with one another. JA___[PX644]; JA___[PX645]; JA___[PX646]; JA___[PX647]. And the meetings were not just aberrant; they yielded decisive action. In their wake, Defendants' respective fuel-surcharge programs became newly vigorous in similar ways—making parallel changes that could not plausibly be explained by happenstance. *See, e.g.*, JA___[PX782] (UP adopting CSX's trigger same week as NFTA meeting); JA___[PX141] (BNSF adopting FSC trigger designed to "reflect[]" UP's and CSX's

week after BNSF/CSX meeting); JA___[PX401] (UP adopting FSC "mirroring" BNSF's); JA___[PX1153] (NS's Seale urging his employees to run the numbers on the UP/CSX formula, which was then not publicly available, right after NFTA meeting). And it was not just the observable prices that changed—administrative policies internal to each railroad suddenly aligned too. *See* pp.11-13, *supra*.

These policy shifts were a significant break from the surcharges of the past, which were rarely invoked and almost never stuck. *See, e.g.*, JA___[PX614] (NS's Glennon: FSCs were only "theoretically billable" pre-conspiracy); JA___[PX612] (CSX's Gooden: FSC participation pre-conspiracy was so low he was "embarrassed"); *see also* p.6, *supra*. With the new fuel-surcharge programs, Defendants no longer had to bemoan the depressing impact competition had on their respective prices; everyone's prices—and profits—rose as competition waned. COF¶¶92,525-53; *see also* pp.10-14, *supra*. In short, on the heels of these unprecedented senior-level meetings, the cost of doing business with all four Defendants suddenly soared, as Defendants achieved prices and surcharge-imposition rates impossible under competitive conditions. Simply put, Defendants discussed raising prices together and then did just that.

Of course, competitors raising their rates at similar times does not, by itself, establish concerted action. So-called "conscious parallelism"—"the process … by which firms in a concentrated market might in effect share monopoly power, setting

their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions"—is "not in itself unlawful." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993). But the evidence here went far beyond parallelism; raising rates here did not just happen. The evidence showed that Defendants' senior-level executives *actually* discussed price-synchronization with each other, and then fortified their surcharges in highly similar ways.

3. All that evidence should have sufficed by itself to send the case to a jury. But that evidence did not stand alone. Plaintiffs also "show[ed] additional circumstances—often referred to as 'plus factors'—which, when viewed in conjunction with the parallel conduct, would permit a fact-finder to infer a conspiracy." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012).

First, evidence showed not only that Defendants had a common motive to conspire and multiple opportunities to do so, *see* pp.6-14, *supra*, but that the railroad industry is particularly susceptible to collusion. The industry is highly concentrated with nearly insurmountable barriers to entry, allowing competitors to easily track each other's FSC coverage—which Defendants did throughout the conspiracy period. Op.121,144; *see* COF¶¶1-12,88-93,326-27,338,353,362,364-67.

Second, Plaintiffs proffered evidence of a key "facilitating practice," i.e., conduct that "makes it easier for parties to coordinate price, output, or other behavior

in an anticompetitive way." 14 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶1407b (4th ed. 2023). Specifically, the evidence showed Defendants used their captive trade organization to exclude fuel costs from its published cost index so the railroads could justify imposing separate and more aggressive FSCs. *See, e.g.*, JA___[PX610] (inter-Defendant discussions of "potentially going to the NEMC meeting to talk about" adopting an industrywide "standard methodology … for fuel surcharge"); JA___[PX76] (BNSF asking "what it would take to start producing" a fuel-free index, which would "add value to the industry"); JA___[PX184].

The RCAF, published by AAR, had long been used to adjust base rates to account for fluctuating input costs, including the cost of fuel. COF¶¶374-81. It had also long been seen as an impediment to imposing across-the-board surcharges, as using both fuel-recovery mechanisms was seen by customers as "double-dipping." COF¶¶375,382. That changed in 2003. Defendants coordinated to pressure AAR to change the RCAF to exclude the price of fuel. COF¶¶387-94. Though AAR initially resisted, it ultimately obliged the four railroads that dominated its membership and dues contributions. JA___[PX184]; COF¶¶34-35. In the end, AAR acceded to its most powerful members, announcing a new, fuel-free index by the end of 2003 called the "all-inclusive index less fuel," or "AII-LF"—which Defendants referred to internally as a "renegade" RCAF. COF¶¶393,398; *see also* COF¶408.

Statements from BNSF's chief economist underscore the radical nature of the change. He stressed that, "[i]n [his] 18-year railroad career, no one had ever succeeded in steering the A.A.R." to "establish a non-fuel RCAF index." JA___[PX77]. He expected that "the combination of sound price escalation using this index and a fuel surcharge should tremendously help [BNSF's] bottom-line for years to come." JA___[PX77]. That is exactly what happened. Whereas "any increase in fuel surcharges" pre-2003 "would result in a decrease in prices of the same amount," due to "competition," JA___[PX88], the competition-free regime led to massive profit increases, *see, e.g.*, JA___[PX65] (BNSF's annual fuel-surcharge revenues rose from $110.5 million in 2003 to $1.7 billion in 2006); *see also* pp.10-13, *supra*. But those ill-gotten gains depended on collusion: As BNSF stated once the conspiracy was underway, while "reliance on fuel surcharge as a mechanism to control fuel prices … is working well now, it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail." JA___[PX126].

Finally, Defendants contemporaneously recognized that the new rate increases vastly outstripped what fuel-cost increases would have engendered on their own, but went to great lengths to conceal that reality from the public. *See, e.g.*, JA___[PX187] (CSX executive internally: "[P]lease don't communicate to anybody outside this company that a customer who pays [the FSC] is paying twice his fair share."); JA___[PX314] (NS executive internally: "We have our story that it is market-based.

How much longer we can get by with that remains a subject of debate."). Internally, Defendants were giddily explicit: the new industrywide FSCs "make money. Big money." JA___[PX110]; *see also, e.g.*, JA___[PX163] (CSX acknowledging internally that while its new formula may "seem[] somewhat benevolent," it was "actually a large increase in fuel surcharge billings—maybe as much as 100%"); JA___[PX93] (BNSF internally stressing that it "believe[s] the FS[C] program is a revenue maximization program, not protection against fuel prices"); JA___[PX402] (UP finance executive commenting internally that he did not "think the historical information and analysis we have on our side will help to 'defend' the $23 threshold"). Publicly, however, Defendants wove a tale that the new surcharges were nothing more than fuel-cost-recoupment mechanisms.

As noted above, STB found Defendants' cover-story misleading and pretextual. *Rail Fuel*, 2007 WL 201205, at *4-5. The evidence here buttressed that conclusion. NS "rebased" (i.e., shoved the surcharge into the base rate) to disguise surcharges and avoid regulatory scrutiny, JA___[PX318]; JA___[PX630.at.187]; JA___[PX98]; *see* Op.146-49. BNSF and UP claimed—falsely—that coal trains incurred higher fuel costs, to justify special escalated FSCs for coal traffic. *Compare* JA___[DA15709], *and* JA___[DA1625], *with* JA___[PX819.¶323]; *see also* n.5, *supra*. And to top it off, the across-the-board FSC changes occurred amidst lower-level employees citing grievances with the new programs—and acknowledging that

the story Defendants told the public about the new FSCs was untrue. *See, e.g.*, JA___[PX254] (NS employees grumbling internally in early 2003 that "there is no need to implement a change" because FSCs "should only be used to recover extraordinary costs," but fuel costs were then flat or declining). Such "pretextual excuses are circumstantial evidence that can disprove the likelihood of independent action." *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 478 (3d Cir. 1998).

In short, the evidence was more than enough to overcome a summary-judgment motion on the element of concerted action.

### B. The District Court Effectively Required Plaintiffs to Prove Their Whole Case Just to Survive Summary Judgment.

The district court concluded otherwise only by imposing a burden on Plaintiffs fundamentally at odds with precedent and bedrock summary-judgment principles. Despite initially intoning the correct standard, Op.33-34, the court quickly abandoned it. According to the court, to survive summary judgment, antitrust plaintiffs must "make the inference of a conspiracy more 'attractive' than the alternative inference of independent action." Op.35 (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 267 (D.C. Cir. 1981)); *see also, e.g.*, Op.37, 70, 95. In other words, Plaintiffs needed to establish the first element of their claim *by a preponderance of the evidence* just to be able to ask a jury to decide whether they could establish that element by a preponderance of the evidence. *See*

Op.37 (deciding whether Plaintiffs met their "burden of demonstrating that an inference of conspiracy is more likely than one of independent action").

1. That is not the law. "Requiring a plaintiff to 'exclude' or 'dispel' the possibility of independent action" just to get to a jury "places too heavy a burden on the plaintiff." *Publication Paper*, 690 F.3d at 63. Asking plaintiffs to present a "more 'attractive'" case than defendants just to defeat summary judgment, Op.35, effectively starts from the baseline that the defendants' theory of the evidence is correct. In other words, it turns Rule 56 upside-down.[6]

Yet the district court repeatedly did just that, usurping the jury's role. Time and again, the court found Plaintiffs' evidence lacked *any* inferential value because it did not affirmatively *disprove* the possibility of interdependent conduct. For instance, the court discounted Defendants' sudden expansion in surcharge coverage because it did not refute the (supposedly) "simple" and "mundane" explanation "that as term contracts reached their end-dates and renegotiations for renewal terms came due over the course of the early 2000s, defendants continued to add FSCs, consistent with their self-interest." Op.66; *see also* Op.67, 105, 138, 140. Likewise, evidence

---

[6] It also raises serious Seventh Amendment concerns. While "a grant of summary judgment does not compromise the Seventh Amendment's jury trial right because that right exists only with respect to genuinely disputed issues of material fact," *Calvi v. Knox Cnty.*, 470 F.3d 422, 427 (1st Cir. 2006), the reason that evidence must be construed in the light most favorable to the non-moving party, in antitrust cases no less than any others, is the Seventh Amendment.

that Defendants discussed competitively sensitive pricing information with one another was not even *probative* to the court without "near simultaneous price increases," because (the court found) "frequent substantive communication among competitors" is common.  Op.106-07.  That turns *Matsushita* and its kin on their head.

The court relied on *In re Text Messaging Antitrust Litigation*, 782 F.3d 867 (7th Cir. 2015), and *In re Baby Food Antitrust Litigation*, 166 F.3d 112 (3rd Cir. 1999), to support its conclusion.  But what explains those cases is not agreement with the district court's misguided view of *Matsushita*; the facts were just far less compelling there.  In *Text Messaging*, all the plaintiffs pointed to was the mere opportunity for defendants to discuss prices at trade-association meetings involving non-defendant market participants—and they offered "no evidence of what information was exchanged at these meetings."  782 F.3d at 878.  And in *Baby Food*, "no evidence" "show[ed] that … any executive of any of the defendants with pricefixing authority communicated with executives of the other defendants."  166 F.3d at 137.  The facts here are vastly different.  Plaintiffs pointed to unprecedented meetings between high-level executives *where pricing was in fact explicitly discussed*—and showed Defendants' respective price formulas changing in similar ways thereafter.  *See, e.g.*, JA___[PX851.at.378] (UP executive: "spoke to … NS this morning and they said that 90% of all their agreements/contracts are subject to

their fuel surcharge and is non-negotiable"); JA___[PX241]; JA___[PX460]; JA___[PX474]; JA___[PX243]; JA___[PX192]; *see also* pp.8-13, *supra*.

Indeed, the more apt comparison here is to *In re Flat Glass Antitrust Litigation*, 385 F.3d 350 (3d Cir. 2004). *Flat Glass* reversed summary judgment for defendants where the evidence showed competitors possessed each other's confidential price information and adopted one another's purportedly internal price increases shortly after meeting. *Id.* at 360. That should sound familiar: Plaintiffs here adduced the same sort of evidence (and then some), showing Defendants possessed just such information about their competitors. *See* pp.7-10, 24-26, *supra*. Given that strong circumstantial evidence of collusion, the court erred in requiring "simultaneous or near-simultaneous price increase[s]." Op.106. A conspiracy to increase prices (or phase out discounts and phase in meaningful surcharges) gradually is no less a per se violation than a conspiracy to do so immediately.

The district court took a similarly errant approach to evidence that Defendants lied to the public about the need for the new FSCs. Because Plaintiffs could not "point to any evidence suggesting that defendants *agreed with one another* on the purported justifications for FSCs," the evidence that Defendants were actively working to shield the truth from customers was supposedly worthless. Op.103-04 (emphasis added); *see also* Op.99-100 & n.34. But there need not be a separate collusive agreement on the precise cover story; a collusive agreement on price is

enough, and even a single defendant lying to the public about fuel prices would be a plus factor supporting a plausible inference that parallel price increases following joint meetings where price was discussed were collusive, not happenstance.

2. The district court seemed to think the Supreme Court demanded this thumb-on-the-scale approach. That is mistaken. To be sure, *Matsushita* held that antitrust plaintiffs "must present evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently." 475 U.S. at 588 (quoting *Monsanto*, 465 U.S. at 764). But *Matsushita* does not "authoriz[e] a court to award summary judgment to antitrust defendants whenever the evidence is plausibly consistent with both inferences of conspiracy and inferences of innocent conduct." *In re Coordinated Pretrial Procs. in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 439 (9th Cir. 1990). On the contrary, *Matsushita*'s "tends to exclude" standard "simply represents an explication of th[e] requirement [that inferences of conspiracy drawn from the evidence be 'reasonable']." *In re Polyurethane Foam Antitrust Litig.*, 152 F.Supp.3d 968, 976 (N.D. Ohio 2015) (alterations in original).

The district court cited a handful of pre-*Matsushita* cases from this Circuit, including *Federal Prescription*, 663 F.2d at 267, ostensibly supporting its contrary approach. *See* Op.35, 70. But *Federal Prescription* is not even a summary-judgment case; it is a (1981) review of a defense verdict after a bench trial under the "clearly erroneous" standard that, to state the obvious, does not demand (or allow) any

inferences be drawn in plaintiffs' favor. 663 F.2d at 267 n.17. Regardless, the Supreme Court has since made clear there is no antitrust-specific standard for summary judgment: "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury." *Kodak*, 504 U.S. at 468.

Furthermore, inferences of conspiracy are reasonable where there is *some* evidence that, if believed, could show that defendants acted in a manner inconsistent with independent conduct. Whether that inference is *more reasonable* than the inferences the defendants ask to be drawn is the ultimate question for the jury. Here, Plaintiffs demonstrated parallel price changes following joint meetings where pricing was concededly discussed, pp.7-10, 24-26, *supra*, and a bevy of plus-factors to boot, pp.26-29, *supra*. That record readily supports an inference of conspiracy.

The district court read *Matsushita* to require that Plaintiffs show inter-Defendant pricing dialogues tethered to "simultaneous" (or "near-simultaneous") and "unusual" lockstep pricing actions across all Defendants. Op.47-69, 105-20. That standard effectively demands proof beyond reasonable doubt of a pricing conspiracy (and a particular kind of price conspiracy, at that)—far more than *Matsushita* requires or Rule 56 tolerates. The Court's point in *Matsushita* was that plaintiffs do not raise a triable issue if *all they have* is evidence of parallel conduct that naturally occurs in a competitive market, and its skepticism there was fueled by the particular claim at issue—that over two dozen defendants had conspired, for a

period of over 20 years, to fix prices *below* what competition would ordinarily yield. *Matsushita*, 475 U.S. at 589, 597. That is why the Court had little trouble in *Matsushita* concluding that the evidence then before it did not tend to exclude the possibility of independent action. *See Brooke Grp.*, 509 U.S. at 227.

But that does not mean antitrust plaintiffs pointing to joint meetings where pricing was actually discussed and reversals of the conditions produced by competition, while alleging a highly plausible conspiracy to increase prices (rather than a moonshot conspiracy to depress prices for decades in hopes of recouping massive profits), should face the same skepticism, let alone have inferences effectively drawn against them at summary judgment. Indeed, precisely because the alleged conspiracy there was so improbable, "*Matsushita* itself said little about proof requirements in a case" like this one, "where underlying structural evidence indicates that the offense is quite plausible and would be profitable for the defendants." Herbert Hovenkamp, *The Rationalization of Antitrust*, 116 Harv. L. Rev. 917, 925-26 (2003). *Kodak*, however, filled that gap. In stark contrast to *Matsushita*, the *Kodak* Court refused to draw inferences in the defendants' favor, because, unlike in *Matsushita*, "[t]he alleged conduct" in *Kodak* was "facially anticompetitive and exactly the harm that antitrust laws aim to prevent." *Kodak*, 504 U.S. at 478. Reading *Matsushita* and *Kodak* together makes clear that "the acceptable inferences which can be drawn from circumstantial evidence vary with the plausibility of the

plaintiffs' theory and the dangers associated with such inferences." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1232 (3d Cir. 1993).

This case—involving unprecedented meetings between senior executives in a highly concentrated industry during which competitively sensitive price information was discussed, followed by the use of a price-raising device that had been feckless under competitive conditions in increasing prices—is the polar opposite of *Matsushita*. There, the plaintiffs posited a scheme not just to collectively depress prices, but to do so *for over 20 years*—with countless benefits to consumer welfare—in hopes of recouping deferred profits years later when most of the conspiring executives were long retired. 475 U.S. at 591. That is what an implausible conspiracy theory looks like. But conspiracies to *raise* prices and stop waiving surcharges "make[] perfect economic sense" and "cannot be mistaken as [] competitive conduct," especially after the same tools yielded virtually nothing in competitive conditions. *Flat Glass*, 385 F.3d at 358. Unlike in *Matsushita*, then— but just like in *Kodak*—fair inferences of collusion from copious evidence of coordination are entirely permissible here.

3. Besides misreading *Matsushita* and its progeny, the district court demanded not just evidence of a conspiracy, but evidence of a highly unusual (and readily detectable) kind of conspiracy featuring precise parallelism and virtually identical conduct. The court fixated on the fine points of each Defendant's formulas, finding

"Defendants' changes during the alleged conspiracy period … made their formulas more *dissimilar*."  Op.45,149.  That conclusion required resolving multiple factual disputes in Defendants' favor, *see, e.g.*, JA___[PX989.Fig.II.10] (expert report showing functional equivalence among Defendants' FSCs post-2003); COF¶511. Even still, the court missed the point:  Defendants did not need verisimilitude; they needed to get tougher on FSCs and not break ranks.  *See* JA___[PX123].

The point of the conspiracy was not to make FSCs identical, but to charge them more often with more aggressive formulas and thus end the destructive (competitive) practice of waiving surcharges.  That objective did not require FSCs to be calculated identically.  Defendants achieved this objective by making their FSCs *similarly aggressive* (so they would be triggered more often, and in greater amounts) and *non-negotiable* (so they would stick).  Before the conspiracy, certain of the formulas may have been similar—but that surface similarity was of little consequence, as the railroads took vastly different approaches to when they were applied, and shippers routinely negotiated around them.  Yet when the conspiracy began, Defendants' pricing *behavior* suddenly changed, and FSCs proliferated and stuck.  As a result, shippers had to pay far more.  Indeed, Plaintiffs' evidence "included admissions by industry insiders, collusive behavior, susceptibility of the industry to collusion, and setting of prices at a supra-competitive level."  *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1264 (10th Cir. 2014).

On this, courts are clear: Conduct need not be identical, in either amount or timing, to be the product of conspiracy. "[P]rices are fixed … if the *range* within purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level …, if they are to be uniform, or if by various formulae they are related to the market prices." *Socony-Vacuum*, 310 U.S. at 222. The minutiae do not matter; prices are fixed not because they are identical but *because they are agreed upon*. *Id.* That is particularly true in the context of negotiated prices, where (to sellers' annoyance) buyers can often negotiate prices downward. In that context, an agreement to stop negotiating away specific upcharges or stop offering discounts is a particularly attractive form of unlawful price-fixing (because it is achievable and not readily detectable), even though—indeed, *because*—it does not produce precisely identical prices. *Urethane*, 768 F.3d at 1264. The district court's undue focus on minor discrepancies among Defendants' rates ignores this reality.

In any event, Defendants' resulting formulas *were* highly parallel—as Defendants themselves recognized. *See, e.g.*, JA___[PX401] (UP acknowledging it had adopted a formula "mirror[ing]" BNSF's); JA___[PX610] (Lanigan testifying that, at $1.35 and above, BNSF's and UP's FSCs "appear to be identical"); JA___[PX474] (UP and CSX executives privately discussing that "both roads start at a $23 trigger," despite their FSC formulas being based on different indices); JA___[PX799] (BNSF noting that the eastern and western railroads' FSCs,

respectively, are "virtually identical for the intermodal programs"); COF¶292 (Defense expert confirming coal FSCs "moved in virtual lockstep");

███████████████████████████████████████████████████████████

████████████████████████████ JA___[PX770.¶103]; COF¶511. That is even clearer when one compares the conspiracy-period rates of the regional competitors to one another. JA___[PX770.¶¶101-02]. CSX and NS had identical trigger prices based on the "WTI" oil index, and BNSF and UP adopted equivalent trigger prices on the HDF index that were intentionally designed to "reflect[] the $23 WTI crude price" CSX and NS used. JA___[PX141]; *see also* JA___[PX610] (Lanigan testifying that BNSF/UP trigger was "roughly equivalent" to CSX/NS's). CSX and NS boasted the same escalators, as did UP and BNSF. And all four Defendants considered the strike price met based on the *average* price over the prior month, even if fuel prices dipped below that trigger for some number of days. *See* COF¶¶117,122-23,158-62,166-74,222-23,242-47. Altogether, the four Defendants' new FSC formulas were highly correlated, irrespective of the relevant index. JA___[PX819¶189,¶247.Fig.III.8].

The district court's analysis of the *timing* of Defendants' pricing changes, Op.52-58, was equally flawed. The court believed that any inference of concerted action was undercut because "Defendants did not rapidly make changes at once or even make them in an efficient fashion," and instead "adopted their alleged

conspiratorial FSCs over the course of *nine months*." Op.53. But the locus of the conspiracy was the agreement to impose FSCs on all traffic—not to set the same exact rate at the same exact time. *See* pp.10-12, *supra*. Regardless, senior executives at all four Defendants moved within days or weeks of each other to crack down on lower-level employees granting exceptions to FSCs, and they did so amid sustained communication with one another. *See* pp.7-12, *supra*.

To be sure, Defendants did not move in total lockstep. But Defendants' *agreement* to bolster FSC coverage was made quickly in spring 2003, *see* pp.24-25, *supra*, and any lag in *implementation* is unimportant. Indeed, "failing to distinguish between the existence of a conspiracy and its efficacy" is one of the three "traps" for the unwary antitrust judge the Seventh Circuit has specifically warned against. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655-56 (7th Cir. 2002). It is also particularly distortive there: Even the district court recognized that relevant changes for BNSF, CSX, and UP took place between March and May. Op.54. The main reason NS took longer was its inability to quickly change course, as its existing FSC was hard-coded into NS contracts—unlike the other Defendants, who incorporated their fuel surcharges *by reference* (enabling a quick switch to a single stand-alone document). COF¶¶206-23. Had the court credited this Plaintiff-friendly inference, rather than view the evidence in the light most favorable to the moving

parties and conflate existence with efficacy, its timeline concerns would simply have been an issue of disputed fact precluding summary judgment.

At bottom, the district court held that only pricing decisions "in sharp succession" count for purposes of raising a jury question of concerted action. Op.58. That is just another way of saying conduct must be nearly identical to be deemed parallel. Conspirators need not march in unison. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir. 2015). The court erred in concluding otherwise.

\*       \*       \*

The question before the district court was (and before this Court now is) whether, viewing the record favorably to Plaintiffs, "the record taken as a whole could" lead "a rational trier of fact" to reasonably infer that Defendants "entered into an illegal conspiracy." *Matsushita*, 475 U.S. at 586-87. The answer to that question is plainly yes. Any other conclusion would suggest Judge Friedman was not "rational." While it is certainly possible for a judge to lose the plot, the far better explanation for the divergence in conclusions the two judges drew from the evidence is that Judge Friedman looked at the evidence holistically through a plaintiff-charitable lens (as Rule 56 and precedent require), whereas Judge Howell did not.

## C. The District Court Considered Plaintiffs' Evidence Piecemeal and Repeatedly Drew Inferences in Defendants' Favor.

In addition to holding Plaintiffs to a well-nigh-impossible standard, the district court took a fundamentally erroneous approach to the facts. Despite black-letter law

prohibiting antitrust courts from "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each," *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), the court did just that. In doing so, it fell prey to the two other "traps" identified in *High Fructose*: "weigh[ing] conflicting evidence (the job of the jury)," and "suppos[ing] that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment." 295 F.3d at 655.

1. The district court repeatedly drew inferences in Defendants' favor. Sometimes it was explicit about this: Because Defendants "had a rational business motive for raising their FSCs," for instance, the "bar" for "what plaintiffs' evidence must tend to exclude" was "effectively rais[ed]." Op.76-77. Other times, the imposition of a heightened standard was veiled. In all instances, it was improper.

Start with the supposed bar-raising principle. Citing almost exclusively defense exhibits, the court concluded that "Defendants' focus on FSCs was driven by erratic and rapidly rising fuel prices in the early 2000s." Op.71. Because "[r]ising input costs is a common, rational explanation for increased prices," and fortifying FSCs was a "logical" response, the existence of this "independent business justification" meant "a conspiracy [could] not be found." Op.70, 74. But to reach this erroneous conclusion, the court had to make several improper inferences in Defendants' favor. For instance, the court stressed that "all four defendants

43

expressly cited fuel costs as the reason for their changes," all the while ignoring plaintiffs' robust evidence showing that defendants internally recognized this explanation was pretextual. Op.74. *But see* COF¶¶450,457-58,460-63,466,470-72. And the court dismissed evidence showing that "fuel costs were 'low' and 'flat' or declining" when the conspiracy began by concluding that Defendants' evidence that they were "preoccupied with fuel costs and the effects on their bottom line" was simply more persuasive than the countervailing facts. Op.73-76. *But see* COF¶514.

The district court's impermissible factfinding did not end there. The court found no "major change" in Defendants' approach to FSC coverage over the conspiracy period, Op.58-69,136, despite a clear dispute of fact about when Defendants ramped up FSC application (and the copious evidence supporting Plaintiffs' view, *see* pp.6-12, 24-25, *supra*), and despite Judge Friedman's finding, on essentially the same evidentiary record, that the conspiracy-period FSCs were "nothing like" what came before, Dkt.550.at.41. Judge Howell nonetheless found, e.g., that BNSF had a "broad, universal coverage polic[y] prior to 2003," relying on a stray line in a 2002 email that "every contract should include a fuel surcharge clause." Op.59-60 (citing JA___[DA4019]). Perhaps the jury could focus on the same email and reach the same conclusion. But given the copious contradictory evidence, that was a call for the jury to make.

The court likewise ignored Plaintiffs' evidence in concluding that "CSX did not adopt similar coverage policies until at least late 2005" and instead "continued to allow the inclusion of the RCAF price escalator index as an alternative to FSCs until then." Op.63. Among other things, Plaintiffs pointed to an internal CSX presentation discussing a May 2004 policy change making "[e]verything … subject to fuel surcharge[s]" and requiring "[e]xceptions [to be] elevated" to senior management." JA___[PX170.at.6]. The presentation stressed that this emphasis on ensuring that everyone paid FSCs merely strengthened "*last year*[*'s*]" policy change requiring FSC application on "[a]ll contracts," which had led to "most [contracts] now includ[ing] a fuel surcharge clause." JA___[PX170.at.3] (emphasis added).

The point here is not that this evidence means Plaintiffs are entitled to summary judgment; perhaps a jury could view the record as the court did. But a reasonable jury certainly could find to the contrary, particularly given the evidence that, just one week after CSX and UP senior executives met to discuss FSCs, CSX announced increases to its FSCs *it had never analyzed before*, and then ordered that all contracts should be reviewed to determine how to convert them to the new FSC. *See* p.8, *supra*. In usurping the jury's proper function, the court fell into the "first" "trap" the Seventh Circuit warned about. *High Fructose*, 295 F.3d at 655.

2. The district court also fell into the "second trap," impermissibly considering Plaintiffs' conspiracy evidence piecemeal. *Id.* at 655-56. "[A] court should not

tightly compartmentalize the evidence put forward by the nonmovant, but instead should analyze it as a whole to see if together it supports an inference of concerted action." *Petruzzi's*, 998 F.2d at 1230. In other words, a court should not "consider each individual piece of evidence and disregard it if [the court] could feasibly interpret it as consistent with the absence of an agreement to raise prices." *Flat Glass*, 385 F.3d at 368; *see also Cont'l Ore*, 370 U.S. at 699.

The district court paid lip-service to this bedrock principle, Op.149-51, but ultimately evaluated Plaintiffs' evidence bit by bit, Op.95-149, wiping the slate clean after scrutiny of each. This resulted in the court approaching its (brief) back-end "holistic" evaluation with its mind already made up: Because the court accepted Defendants' explanation of the pretextual justifications and accepted Defendants' denials that they discussed FSC coordination or exchanged pricing information, that the adoption of the new RCAF was innocent coincidence, and that they all decided to expand FSCs coverage before the conspiracy period—nothing plus nothing meant nothing, and no inference of conspiracy was warranted. Voila. But had the court properly considered the evidence comprehensively and in light of what a jury could reasonably believe it showed, it would have confronted a vastly different world— where Defendants' senior executives held unprecedented meetings in 2003 to discuss synchronizing FSCs; where formula changes and coverage-policy alterations following these meetings made FSCs far more robust and aggressive than previously

possible; where Defendants covered up the reasons for these changes; where Defendants collectively pressured a trade association to facilitate profit-reaping FSCs; and where Defendants finally could "make money"—"Big money"—on FSCs, JA___[PX110]. Taking the evidence holistically and in the most Plaintiffs-favorable light, as Rule 56 demands, a reasonable jury could easily find collusion.

In holding otherwise, the district court started by resolving a factual dispute, finding that "defendants did discuss pricing with one another prior to the conspiracy, including sometimes about interline FSCs." Op.137. Prior price discussions between executives in a highly concentrated industry is hardly exculpatory, but this finding was still highly debatable. The only on-point support for this factual conclusion was testimony from a CSX executive, who could recall one discussion between himself and a UP executive about FSCs before 2003. Op.137 (citing JA___[PX595.at.194-95]). This single pre-2003 discussion between a railroad without a fuel surcharge (UP) and a railroad with one (CSX), about an administrative billing issue, JA___[PX595.at.197-98], sharply contrasts with the many senior-executive-level inter-Defendant discussions about industrywide FSCs that only began in 2003, *see* pp.7-10, *supra*. Indeed, even though proving a negative is notoriously difficult, Plaintiffs *actually did that*, showing that Defendants did not report *any* meetings between 2000-2003. COF¶94. Yet the court brushed all this aside—and based on that dubious (and improper) factual determination, concluded

that the unprecedented deluge of senior-level meetings in 2003 was not "so widespread to represent a sea change." Op.136-37.

The court followed the same approach in picking apart evidence that Defendants discussed price-coordination during the conspiracy period. Discovery uncovered handwritten notes from a CSX/UP meeting showing that Defendants discussed unified action in potentially adjusting FSC trigger prices during the conspiracy period. *E.g.*, JA___[PX474]. Even by itself, that evidence tends to show concerted action. But the court brushed it aside, minimizing it (without any evidentiary basis) as "[a] brief, sidebar conversation about FSCs" that "could have been of interest to a particular individual employee while being of no moment to the broader group." Op.139. But "could have" is the whole story. It is the role of the jury to decide which inference is most reasonable. Yet the court took that job away from the jury, concluding that the notes reflected merely the "simple, straightforward observation that market forces may require defendants to adapt pricing over time," instead of evidence that tends to show Defendants' "agree[ment] to move their prices in tandem or to maintain the same formula." Op.118-19. While that sort of defense-friendly spin may be "well-suited for an argument before a jury," it should be "irrelevant" to a court's summary-judgment decision. *Flat Glass*, 385 F.3d at 368.

The court similarly erred in framing the July 2003 BNSF-NS meeting. *See* p.10, *supra.* Evidence shows senior executives at the two competitors held a

"discussion of a *potential industry position* on fuel surcharge provisions." JA___[PX243.at.3] (emphasis added). But the court discarded this evidence, concluding that backpedaling testimony from a BNSF executive "foreclose[d] any inference that conspiratorial discussion occurred" at that meeting. Op.119. It is difficult to imagine a more blatant example of a court weighing evidence (and making credibility determinations)—or a better encapsulation of the need for reversal so the jury can do the factfinding.

The court similarly downplayed meeting minutes between NS and UP. Senior executives from those two Defendants gathered in May 2003 to discuss "fuel surcharges and various application processes," and they reached "[c]onsensus" at the meeting "that it would be a positive outcome if all roads had the same process in the eyes of our customers." JA___[PX241]; *see also* JA___[PX460]. A reasonable jury could well find this evidence damning. But the district court minimized it—literally. The court relegated it to a footnote stating that, in the court's view, it did "not reflect a desire harbored by defendants for uniform *prices*, as plaintiffs suggest—instead referring to customers' desire for more uniformity in, and concomitant ease in shippers' understanding of, the logistics for imposition of FSCs." Op.49.n.12. In doing so, the court ignored evidence that NS's Seale wrote to his boss two days before the NS-UP meeting "regarding our conversation with UP this week" that he was troubled that BNSF was still granting FSC waivers, the "industry is not looking

49

good on this issue," and "a stable approach has been the best approach." JA___[PX303.at.321]. Given that customers naturally desire lower prices, a reasonable jury could readily find that this evidence undermines Defendants' assertion (adopted by the district court) about what was discussed at this meeting.

In the end, after discounting the potential conspiratorial import of each meeting, one by one, the court offered its own explanatory arc: "Volatile fuel costs continued to concern defendants, and discussions may have come up more frequently as defendants focused on addressing this market condition through FSCs." Op.138. "May have," indeed. But a series of unprecedented meetings "may have" been powerful evidence of a conspiracy to synchronize surcharges and stop the profit-destroying practice of negotiating away surcharges. The choice between those alternative "may haves" is plainly the province of the jury.

*        *        *

Lest there be any doubts, Judge Friedman's earlier conclusions erase them. Judge Friedman found by a preponderance of the evidence, and on the same record, that "the fuel surcharge programs applied before the [conspiracy] period were nothing like the widespread and uniform application of standardized fuel surcharges during the [conspiracy] period," which were "of a different breed" and employed "in lockstep" by Defendants. Dkt.550.at.87. Judge Howell dismissed this finding, claiming that it "was made in the limited context of concluding that an injury-in-fact

would be 'capable of proof at trial with evidence common to the class,'" the "finding was made before evidentiary exclusions based on Section 10706," and the class certification posture "did not concern whether plaintiffs could 'prove their case.'" Op.96.n.27; *see also* Op.136. Those arguments do not add up.

First, Judge Friedman did not just find that Plaintiffs' claims were capable of common proof; he found that *the evidence before him*—all of which was before Judge Howell at summary judgment—demonstrated that the "uniform" FSCs Defendants adopted over the course of 2003 "were nothing like" what came before. Dkt.550.at.86. If that does not raise a triable question about concerted action, it is hard to know what could. Second, while Plaintiffs certainly did not need to "prove their case" at class certification, Op.96.n.27, they *also* did not need to do so at summary judgment; Plaintiffs just needed to raise a triable question. Third, Judge Howell's §10706 critique is baseless. Judge Friedman set the challenged evidence aside when making both class-certification determinations, Dkt.550.at.22; Dkt.853.at.35.n.5, and then stressed on remand that Plaintiffs "again present[ed] substantial documentary evidence that indicates that defendants" "created new, aggressive fuel surcharge formulas," "intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies," and "viewed their fuel surcharge programs as profit centers," Dkt.853.at.131.

The point is not that Judge Howell should have deferred to Judge Friedman. It is that when two jurists looking at the same facts come to different conclusions about their import, the ultimate determination is for neither jurist, but for the jury.

## II. The District Court Erred In Excluding Defendants' Statements That Did Not "Concern[] An Interline Movement Of The Rail Carrier."

As detailed, the summary-judgment record the district court considered amply permitted a reasonable jury to find that Defendants colluded to raise prices. But that record was erroneously incomplete. Back in 2020, Defendants moved to exclude certain key documents, arguing that they reflected discussions "concern[ing] an interline movement of the rail carrier," which generally are shielded from admission under 49 U.S.C. §10706(a)(3)(B)(ii)(II).[7] Dkt.1008.at.1. After the district court's initial ruling on the issue, this Court clarified §10706's meaning and remanded for further consideration. Specifically, this Court held that "evidence of discussions or agreements about single-line traffic or about freight traffic generally is not excludable under Section 10706." 34 F.4th at 9. Despite that guidance, the district court expanded §10706 on remand, excluding 28 documents and redacting 16 others based on the misguided view that a discussion of FSCs plus a discussion of interline rail movements meant that §10706 excluded both discussions. Dkt.1123.at.8-15.

---

[7] As explained, "interline movements are shipments carried along two or more railroads' tracks under a common arrangement"; in contrast, "single-line shipments are moved by one carrier on its own tracks." 34 F.4th at 6.

According to the district court, if "[t]he focus of" *any* discussions in a document was "'the carriers' shared interline traffic,'" then the document had to be excluded, no matter how pervasive "[r]eferences to non-interline traffic" were in the rest of the document. Dkt.1123.at.8. That gets this Court's opinion backwards. This Court was clear that, in the context of a document containing discussions of both interline traffic and single-line traffic, §10706 applies only "if the carriers demonstrate that the reference [to single-line traffic] was either fleeting and inconsequential or appropriate to the advancement of the interline discussion itself." 34 F.4th at 9-10. Yet the district court did not find that *any* reference to generally applicable FSCs in *any* of the documents it excluded or redacted were fleeting or inconsequential; it just reached its own conclusions about the focus of Defendants' discussions, despite far more than de minimis references to FSCs for "freight traffic generally," which "is not excludable under Section 10706." *Id.* at 9. Under the correct standard, all of the disputed documents should be admitted in full, or, at minimum, admitted with redactions consistent with Plaintiffs' proposals. *See* SJA__[Dkt.1134]; SJA__[Dkt.1134-1]. As the same legal error marred the court's §10706 ruling across the board, a few examples suffice to prove the point:

To start, the court erroneously required redactions of PX145, an annotated "Agenda" of a March 2003 "Senior Team Meeting" between BNSF and NS. *See*

SJA___[Reconsideration.Op.6-9].[8]  This meeting included many discussions, some of which may have addressed interline shipments.  However, the court erroneously redacted portions that clearly referenced a discussion concerning "freight traffic generally," which "is not excludable under Section 10706."  34 F.4th at 9.

The agenda reflects that, as part of a "General Business Review Discussion," senior executives strategized about aligning FSCs across Defendants:

1) **General Business Review Discussion**
   a) Interline Volumes by Business Group
   b) Projections for Q-2

*Action Item:*

*BNSF's fuel surcharge is structured differently than NS, CSX, and UP.  Should BNSF's by synchronized with the other big players in the industry?(John Lanigan/Don Seale)*

This portion of the agenda is not cabined to BNSF and NS's "shared interline traffic." *See id.*  Instead, Lanigan and Seale studied the structure of "BNSF's fuel surcharge," surveyed the "big players," and then settled on synchronization for "the industry." JA___[PX145.at.1]; *see also* JA___[PX243.at.3] (reflecting that Lanigan and Seale later "agreed to lead a discussion of a potential industry position on fuel surcharge provisions at the next N.E.M.C. meeting"); JA___[PX241.at.2] (NS's Seale "[d]iscuss[ing] … fuel surcharge … as used by different roads," and reaching "[c]onsensus" with UP counterpart "that it would be a positive outcome if all roads

_____

[8] The district court issued two opinions on remand relating to §10706.  The first, Dkt.1123, is available on the docket; the second, resolving Plaintiffs' reconsideration motion, was filed under seal.

had the same process").  While this *general* discussion affected "Interline Volumes"

(a subset of the business), a common-sense reading of the agenda confirms that

Lanigan and Seale were tasked with surveying FSCs *generally across the industry*

and queried whether BNSF's could be harmonized.  JA___[PX145].  The action item

did not limit their discussion to interline movements, let alone to any "shared" and

"identifiable" ones between BNSF and NS.  *See* 34 F.4th at 10, 12-13.

Although the district court originally excluded the meeting agenda in full, it

agreed to admit the agenda with redactions on Plaintiffs' motion for reconsideration.

But it nonetheless excluded the damning action item.

███████████████████████████████████████████

███████████████████████████████████████████

As another example of the court's erroneous approach to §10706, consider PX202, which the district court "excluded in full." Dkt.1123.at.8. This document reflects an email exchange between UP and CSX executives setting the agenda for a March 2003 meeting. This exhibit is highly relevant, as it shows that CSX and UP executives discussed "[f]uel surcharge methodology" less than two weeks before CSX adopted *the same escalator that UP had only considered internally*. JA___[PX202]; *see* JA___[PX185]. And while the fuel-surcharge tasks in this document fall under the heading "Other Pricing Issues on CSX/UP Interline Business." JA___[PX202], as just noted, any reference to "[f]uel surcharge *methodology*" is a reference to surcharges *writ large*, as each railroad had *one* surcharge for both traffic types. To treat any discussion of surcharges as excludable so long as their use in interline traffic was touched upon would effectively "immuni[ze] anticompetitive actions." 34 F.4th at 10. And it would be particularly perverse here, given that the document provides direct evidence about what was discussed at this meeting. PX202 should thus be admitted.[9]

---

[9] At the very least, PX202 should be admitted with redactions, as the remainder of the document involved unrelated discussions.

Finally, the court's exclusionary errors "affected the outcome of the district court proceedings." *Muldrow ex rel. Est. of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 168 (D.C. Cir. 2007). Analysis of just *one* of the wrongly excluded documents makes this clear, as PX202 is precisely the type of evidence that "tends to exclude" conscious parallelism under a proper interpretation of *Matsushita*. Simply put, Plaintiffs were prejudiced by the erroneous exclusion of these documents. While it is clear this case was wrongfully taken away from a jury even without the wrongly shielded documents, when the jury ultimately hears this case, it should have the benefit of all the available evidence allowed by this Court's construction of §10706.

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
MATTHEW D. ROWEN
JULIA R. GRANT[*]
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiffs-Appellants in Nos. 25-7103, 25-7104, 25-7107, 25-7108*

December 12, 2025

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(e) because it contains 12,926 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(a)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

December 12, 2025

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

# ADDENDUM

# TABLE OF CONTENTS

15 U.S.C. § 1 ..................................................................................1a

49 U.S.C. § 10706 ..........................................................................2a

United States Code Annotated
   Title 15. Commerce and Trade
   Chapter 1. Monopolies and Combinations in Restraint of Trade (Refs & Annos)

15 U.S.C.A. § 1

§ 1. Trusts, etc., in restraint of trade illegal; penalty

Currentness

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

### CREDIT(S)

(July 2, 1890, c. 647, § 1, 26 Stat. 209; Aug. 17, 1937, c. 690, Title VIII, 50 Stat. 693; July 7, 1955, c. 281, 69 Stat. 282; Pub.L. 93-528, § 3, Dec. 21, 1974, 88 Stat. 1708; Pub.L. 94-145, § 2, Dec. 12, 1975, 89 Stat. 801; Pub.L. 101-588, § 4(a), Nov. 16, 1990, 104 Stat. 2880; Pub.L. 108-237, Title II, § 215(a), June 22, 2004, 118 Stat. 668.)

15 U.S.C.A. § 1, 15 USCA § 1
Current through P.L. 119-47. Some statute sections may be more current, see credits for details.

**End of Document**     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.     1

United States Code Annotated
    Title 49. Transportation (Refs & Annos)
        Subtitle IV. Interstate Transportation (Refs & Annos)
            Part A. Rail (Refs & Annos)
                Chapter 107. Rates (Refs & Annos)
                    Subchapter I. General Authority

49 U.S.C.A. § 10706

§ 10706. Rate agreements: exemption from antitrust laws

Currentness

**(a)(1)** In this subsection--

**(A)** the term "affiliate" means a person controlling, controlled by, or under common control or ownership with another person and "ownership" refers to equity holdings in a business entity of at least 5 percent;

**(B)** the term "single-line rate" refers to a rate or allowance proposed by a single rail carrier that is applicable only over its line and for which the transportation (exclusive of terminal services by switching, drayage or other terminal carriers or agencies) can be provided by that carrier; and

**(C)** the term "practicably participates in the movement" shall have such meaning as the Board shall by regulation prescribe.

**(2)(A)** A rail carrier providing transportation subject to the jurisdiction of the Board under this part that is a party to an agreement of at least 2 rail carriers that relates to rates (including charges between rail carriers and compensation paid or received for the use of facilities and equipment), classifications, divisions, or rules related to them, or procedures for joint consideration, initiation, publication, or establishment of them, shall apply to the Board for approval of that agreement under this subsection. The Board shall approve the agreement only when it finds that the making and carrying out of the agreement will further the transportation policy of section 10101 of this title and may require compliance with conditions necessary to make the agreement further that policy as a condition of its approval. If the Board approves the agreement, it may be made and carried out under its terms and under the conditions required by the Board, and the Sherman Act (15 U.S.C. 1, et seq.), the Clayton Act (15 U.S.C. 12, et seq.), the Federal Trade Commission Act (15 U.S.C. 41, et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a) do not apply to parties and other persons with respect to making or carrying out the agreement. However, the Board may not approve or continue approval of an agreement when the conditions required by it are not met or if it does not receive a verified statement under subparagraph (B) of this paragraph.

**(B)** The Board may approve an agreement under subparagraph (A) of this paragraph only when the rail carriers applying for approval file a verified statement with the Board. Each statement must specify for each rail carrier that is a party to the agreement--

**(i)** the name of the carrier;

**2a**

**(ii)** the mailing address and telephone number of its headquarter's office; and

**(iii)** the names of each of its affiliates and the names, addresses, and affiliates of each of its officers and directors and of each person, together with an affiliate, owning or controlling any debt, equity, or security interest in it having a value of at least $1,000,000.

**(3)(A)** An organization established or continued under an agreement approved under this subsection shall make a final disposition of a rule or rate docketed with it by the 120th day after the proposal is docketed. Such an organization may not--

**(i)** permit a rail carrier to discuss, to participate in agreements related to, or to vote on single-line rates proposed by another rail carrier, except that for purposes of general rate increases and broad changes in rates, classifications, rules, and practices only, if the Board finds at any time that the implementation of this clause is not feasible, it may delay or suspend such implementation in whole or in part;

**(ii)** permit a rail carrier to discuss, to participate in agreements related to, or to vote on rates related to a particular interline movement unless that rail carrier practicably participates in the movement; or

**(iii)** if there are interline movements over two or more routes between the same end points, permit a carrier to discuss, to participate in agreements related to, or to vote on rates except with a carrier which forms part of a particular single route. If the Board finds at any time that the implementation of this clause is not feasible, it may delay or suspend such implementation in whole or in part.

**(B)(i)** In any proceeding in which a party alleges that a rail carrier voted or agreed on a rate or allowance in violation of this subsection, that party has the burden of showing that the vote or agreement occurred. A showing of parallel behavior does not satisfy that burden by itself.

**(ii)** In any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section or of any similar State law, proof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic. In any proceeding in which such a violation is alleged, evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement, shall not be admissible if the discussion or agreement--

**(I)** was in accordance with an agreement approved under paragraph (2) of this subsection; or

**(II)** concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause.

In any proceeding before a jury, the court shall determine whether the requirements of subclause (I) or (II) are satisfied before allowing the introduction of any such evidence.

**3a**

**(C)** An organization described in subparagraph (A) of this paragraph shall provide that transcripts or sound recordings be made of all meetings, that records of votes be made, and that such transcripts or recordings and voting records be submitted to the Board and made available to other Federal agencies in connection with their statutory responsibilities over rate bureaus, except that such material shall be kept confidential and shall not be subject to disclosure under section 552 of title 5, United States Code.

**(4)** Notwithstanding any other provision of this subsection, one or more rail carriers may enter into an agreement, without obtaining prior Board approval, that provides solely for compilation, publication, and other distribution of rates in effect or to become effective. The Sherman Act (15 U.S.C. 1 et seq.), the Clayton Act (15 U.S.C. 12 et seq.), the Federal Trade Commission Act (15 U.S.C. 41 et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a) shall not apply to parties and other persons with respect to making or carrying out such agreement. However, the Board may, upon application or on its own initiative, investigate whether the parties to such an agreement have exceeded its scope, and upon a finding that they have, the Board may issue such orders as are necessary, including an order dissolving the agreement, to ensure that actions taken pursuant to the agreement are limited as provided in this paragraph.

**(5)(A)** Whenever two or more shippers enter into an agreement to discuss among themselves that relates to the amount of compensation such shippers propose to be paid by rail carriers providing transportation subject to the jurisdiction of the Board under this part, for use by such rail carriers of rolling stock owned or leased by such shippers, the shippers shall apply to the Board for approval of that agreement under this paragraph. The Board shall approve the agreement only when it finds that the making and carrying out of the agreement will further the transportation policy set forth in section 10101 of this title and may require compliance with conditions necessary to make the agreement further that policy as a condition of approval. If the Board approves the agreement, it may be made and carried out under its terms and under the terms required by the Board, and the antitrust laws set forth in paragraph (2) of this subsection do not apply to parties and other persons with respect to making or carrying out the agreement. The Board shall approve or disapprove an agreement under this paragraph within one year after the date application for approval of such agreement is made.

**(B)** If the Board approves an agreement described in subparagraph (A) of this paragraph and the shippers entering into such agreement and the rail carriers proposing to use rolling stock owned or leased by such shippers, under payment by such carriers or under a published allowance, are unable to agree upon the amount of compensation to be paid for the use of such rolling stock, any party directly involved in the negotiations may require that the matter be settled by submitting the issues in dispute to the Board. The Board shall render a binding decision, based upon a standard of reasonableness and after taking into consideration any past precedents on the subject matter of the negotiations, no later than 90 days after the date of the submission of the dispute to the Board.

**(C)** Nothing in this paragraph shall be construed to change the law in effect prior to October 1, 1980, with respect to the obligation of rail carriers to utilize rolling stock owned or leased by shippers.

**(b)** The Board may require an organization established or continued under an agreement approved under this section to maintain records and submit reports. The Board may inspect a record maintained under this section.

**(c)** The Board may review an agreement approved under subsection (a) of this section and shall change the conditions of approval or terminate it when necessary to comply with the public interest and subsection (a). The Board shall postpone the effective date of a change of an agreement under this subsection for whatever period it determines to be reasonably necessary to avoid unreasonable hardship.

**4a**

**(d)** The Board may begin a proceeding under this section on its own initiative or on application. Action of the Board under this section--

    **(1)** approving an agreement;

    **(2)** denying, ending, or changing approval;

    **(3)** prescribing the conditions on which approval is granted; or

    **(4)** changing those conditions,

has effect only as related to application of the antitrust laws referred to in subsection (a) of this section.

**(e)(1)** The Federal Trade Commission, in consultation with the Antitrust Division of the Department of Justice, shall prepare periodically an assessment of, and shall report to the Board on--

    **(A)** possible anticompetitive features of--

        **(i)** agreements approved or submitted for approval under subsection (a) of this section; and

        **(ii)** an organization operating under those agreements; and

    **(B)** possible ways to alleviate or end an anticompetitive feature, effect, or aspect in a manner that will further the goals of this part and of the transportation policy of section 10101 of this title.

**(2)** Reports received by the Board under this subsection shall be published and made available to the public under section 552(a) of title 5.

**CREDIT(S)**

  (Added Pub.L. 104-88, Title I, § 102(a), Dec. 29, 1995, 109 Stat. 812; amended Pub.L. 104-287, § 5(24), Oct. 11, 1996, 110 Stat. 3390.)

Notes of Decisions (14)

49 U.S.C.A. § 10706, 49 USCA § 10706
Current through P.L. 119-47. Some statute sections may be more current, see credits for details.