## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

In re Rail Freight Fuel Surcharge Antitrust Litigation (No. I), MDL No. 1869

Donnelly Commodities Incorporated, on behalf of itself and all others similarly situated, Strates Shows, Inc., and Olin Corporation,
*Plaintiffs-Appellants*,

v.

BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company,
*Defendants-Appellees*,

Southern Company, Dow Chemical Company, and Rayonier Inc.,
*Intervenors-Appellees*.

[*Case Captions Continued on Inside Cover*]

On appeal from the United States District Court for the District of Columbia, No. 1:07-mc-00489

## BRIEF OF *AMICI CURIAE* ANTITRUST LAW AND ECONOMICS PROFESSORS IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Victoria Sims
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 751-5441
victoria.sims@simonsensussman.com
*Counsel for Amici Curiae Antitrust*
*Law and Economics Professors*

John M. Newman
Herff Chair of Excellence
University of Memphis
School of Law
*On the Brief*

―――――――――――――――

25-7104

―――――――――――――――

In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II), MDL No. 2925

American Honda Motor Co., Inc., et al.,
*Plaintiffs-Appellants*,

v.

Union Pacific Railroad Company, et al.,
*Defendants-Appellees*.

―――――――――――――――

25-7105

―――――――――――――――

In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II), MDL No. 2925

Lansing Ethanol, et al.,
*Plaintiffs-Appellants*,

v.

Union Pacific Railroad Company, et al.,
*Defendants-Appellees*.

―――――――――――――――

25-7107

―――――――――――――――

In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II), MDL No. 2925

Suzuki Motor of America, Inc., et al.,
*Plaintiffs-Appellants*,

v.

Union Pacific Railroad Company, et al.,
*Defendants-Appellees*.

Oxbow Carbon & Minerals, LLC, et al.,
*Plaintiffs-Appellants*,

v.

Union Pacific Railroad Company, et al.,
*Defendants-Appellees*.

**STATEMENT OF AUTHORSHIP AND CONSENT**

All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part, no party or their counsel contributed money intended to fund the preparation or submission of this brief, and no person other than *Amici Curiae* or their counsel contributed money that was intended to fund preparing or submitting the brief.

**CERTIFICATE REGARDING SEPARATE BRIEF**

Pursuant to D.C. Circuit Rule 29(d), this separate amicus brief is necessary because it provides the unique insights of antitrust law and economics professors regarding precedent and empirical evidence relating to assumptions relied upon by the District Court. The arguments presented in this brief are distinct from the arguments presented in the briefs of other *amici curiae*.

## TABLE OF CONTENTS

STATEMENT OF AUTHORSHIP AND CONSENT ................................................ i

CERTIFICATE REGARDING SEPARATE BRIEF ................................................ i

IDENTITIES AND INTEREST OF *AMICI CURIAE* ................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

I.   THE DISTRICT COURT'S OPINION RELIED EXTENSIVELY ON THE "MERE INTERDEPENDENCE" FALLACY ....................................................6

II.  THE "MERE INTERDEPENDENCE" FALLACY RELIES ON DISPROVEN ASSUMPTIONS.........................................................................8

   A. Mere Interdependence Is Generally More Risky and Potentially Costly to Initiate, and More Difficult and Costly to Manage, Than an Agreement in These Markets........................................................................8

   B. Agreements Are Easier to Initiate, Manage, and Conceal, and Are More Profitable and Longer-Lasting, in Concentrated Markets ..............................10

   C. Even Firms in More Highly Concentrated Markets Than These Have Opted for Agreements Instead of Mere Interdependence.........................................11

III. THE DISTRICT COURT COMMITTED MULTIPLE REVERSIBLE ERRORS ...........................................................................................13

   A. It Was Error to Hold That High Market Concentration, Entry Barriers, and Demand Inelasticity Are Irrelevant to the Agreement Inquiry ......................14

   B. It Was Error to Hold That a Common Motive to Conspire Is Irrelevant to the Agreement Inquiry.........................................................................17

   C. It Was Error to Hold That Rival-to-Rival Communications About Pricing Strategies Are Irrelevant to the Agreement Inquiry.......................................19

   D. It Was Error to View Highly Probative Evidence in a Vacuum, Divorced from Relevant Context...................................................................24

CONCLUSION ...................................................................................28

CERTIFICATE OF COMPLIANCE ...................................................................30

# TABLE OF AUTHORITIES

**Cases**

*B & R Supermarket, Inc. v. Visa Inc.*, No. 17-CV-2738 (MKB), 2024 U.S. Dist.
LEXIS 175982 (E.D.N.Y. Sep. 25, 2024) ............................................................17

*Borozny v. Raytheon Techs. Corp.*, No. 3:21-CV-1657-SVN, 2023 U.S. Dist.
LEXIS 9914 (D. Conn. Jan. 20, 2023) ................................................................20

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)....9

*City of Moundridge v. Exxon Mobil Corp.*, No. 04-040, 2009 U.S. Dist. LEXIS
123954 (D.D.C. Sep. 30, 2009) ..........................................................................21

*City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516
(S.D.N.Y. 2020) ............................................................................................ 20, 23

*City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730
(N.D. Ill. 2019) ...................................................................................................28

*Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025
U.S. Dist. LEXIS 22329 (D. Conn. Feb. 7, 2025)..............................................19

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ... 5, 19, 25

*Crownalytics, LLC v. SPINS LLC*, No. 22-CV-01275-NYW-JPO, 2024 U.S. Dist.
LEXIS 85478 (D. Colo. May 10, 2024) ....................................................... 14, 19

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013)........14

*Flannery Assocs. LLC v. Barnes Fam. Ranch Assocs., LLC*, 727 F. Supp. 3d 895
(E.D. Cal. 2024)...................................................................................................17

*Gainesville Utils. Dep't v. Fla. Power & Light Co.*, 573 F.2d 292
(5th Cir. 1978) ........................................................................................10, 11, 22

*Greco v. Mallouk*, No. 22 C 2661, 2024 U.S. Dist. LEXIS 161475 (N.D. Ill. Sept.
9, 2024)................................................................................................................17

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) ........................ 21, 23

*In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750 (E.D. Pa. 2017)...........15

*In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015) 7, 8, 19

*In re Coordinated Pretrial Procs. in Petrol. Prods. Antitrust Litig.*, 906 F.2d 432 (9th Cir. 1990) .................................................................................9

*In re Disposable Contact Lens Antitrust Litig.*, 739 F. Supp. 3d 1118 (M.D. Fla. 2024).....................................................................................17

*In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46 (D.D.C. 2016) .................................................................... 6, 25

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004) ............. 18, 24, 25, 26

*In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CM-27241, 2025 U.S. Dist. LEXIS 167372 (E.D. Pa. Aug. 27, 2025) .............................................14

*In re Granulated Sugar Antitrust Litig.*, MDL No. 24-3110 (JWB/DTS), 2025 U.S. Dist. LEXIS 21417 (D. Minn. Oct. 15, 2025).....................................14

*In re Interior Molded Doors Antitrust Litig.*, Nos. 3:18-cv-00718, 3:18-cv-00850, 2019 U.S. Dist. LEXIS 161045 (E.D. Va. Sept. 18, 2019) .................................11

*In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 U.S. Dist. LEXIS 208215 (N.D. Ill. Nov. 6, 2020) .........................................................15

*In re Manufactured Home Lot Rents Antitrust Litig.*, No. 23-CV-06715, 2025 U.S. Dist. LEXIS 250374 (N.D. Ill. Dec. 4, 2025) .....................................17

*In re Outpatient Med. Ctr. Emps. Antitrust Litig.*, 630 F. Supp. 3d 968 (N.D. Ill. 2022).............................................................................. 18, 20

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991 (N.D. Ill. 2011) .................................................................15

*In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968 (N.D. Ohio 2015).20

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696 (E.D. La. 2013).....................................................................................15

*In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758 (D. Minn. 2025) .................... 17, 25

*In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712 (S.D.N.Y. 2017) ...............15

iv

*In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51 (2d Cir. 2012) ..............................23

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478 (M.D. Tenn. 2023) ......................................................................................25

*In re Realpage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 3:23-MD-03071, 2025 WL 3257456 (M.D. Tenn. Nov. 21, 2025) ....................................17

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010)........................14

*Interstate Cir., Inc. v. United States*, 306 U.S. 208 (1938) .......................................6

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018).............................................................20

*JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585 (S.D. Tex. 2022).........14

*Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013) .......................17

*Mitchael v. Intracorp, Inc.*, 179 F.3d 847 (10th Cir. 1999)......................................17

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68 (2d Cir. 2025)  17, 19

*O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, No. 19-CV-00742 (NGG) (LB), 2023 U.S. Dist. LEXIS 45497 (E.D.N.Y. Mar. 10, 2023) ...........................20

*Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087 (D.N.M. 2024) ......................................................................................17

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002 (E.D. Mo. 2018) .............................................................................................15

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 1009 (6th Cir. 1999).....................17

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015), *as amended on reh'g in part*, No. 14-1746, 2015 U.S. App. LEXIS 16412 (4th Cir. Sep. 15, 2015)......................................................................................................14

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, No. 1:09-CV-00560, 2013 U.S. Dist. LEXIS 21744 (E.D. Cal. Feb. 15, 2013) .....................................15

*Team Cam, LLC v. Reliable Contracting Co.*, No. CV 24-1545-TDC, 2025 U.S. Dist. LEXIS 65221 (D. Md. Apr. 4, 2025) ............................................................14

*Theatre Enters. v. Paramount Distrib'g*, 346 U.S. 537 (1954)................................6

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ...................................................14

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015)........................................17

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ...............................28

*United States v. Joint Traffic Ass'n*, 171 U.S. 505 (1898) .........................................6

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948) ..............................6

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) ........................................5

*United States v. Trans-Mo. Freight Ass'n*, 166 U.S. 290 (1897) ...............................6

*Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ......8

**Statutes**
15 U.S.C. § 1 ............................................................................................. 1, 6, 17

**Other Authorities**
Arthur G. Fraas & Douglas F. Greer, *Market Structure and Price Collusion: An Empirical Analysis*, 26 J. Indus. Econ. 21 (1977) ................................................15

Christopher R. Leslie, *Antitrust's Interdependence Paradox*, 111 Va. L. Rev. 787 (2025)....................................................................... 2, 4, 7, 9, 10, 15, 16, 19, 20

Christopher R. Leslie, *How to Hide a Price-Fixing Conspiracy: Denial, Deception, and Destruction of Evidence*, 2021 U. Ill. L. Rev. 1199 (2021) ..................... 2, 24

Christopher R. Leslie, *The Decline and Fall of Circumstantial Evidence in Antitrust Law*, 69 Am. U. L. Rev. 1713 (2020) ....................................................28

Christopher R. Leslie, *The Factor/Element Distinction in Antitrust Litigation*, 64 Wm. & Mary L. Rev. 585 (2023) ........................................................................18

Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. U. L. Rev. 1581 (2021)........................................... 18, 20, 22

Christopher R. Leslie, *Trust, Distrust, and Antitrust*, 82 Tex. L. Rev. 515 (2004)..10

George A. Hay & Daniel Kelley, *An Empirical Survey of Price-Fixing Conspiracies*, 17 J. L. & Econ. 13 (1974)..................................................... 10, 15

Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813 (2011).....................................................................................11

John M. Connor, Global Price Fixing (2d ed. 2008) .................................................2

John M. Connor, *Price-Fixing Overcharges: Legal and Economic Evidence*, Am. Antitrust Inst. Working Paper No. 04-05 (2004)..................................................12

Kai-Uwe Kühn, *Fighting Collusion by Regulating Communication Between Firms*, 16 Econ. Pol'y 169 (2001).....................................................................................22

Louis Kaplow, *Direct Versus Communications-Based Prohibitions on Price Fixing*, 3 J. Legal Analysis 449 (2011) ...........................................................................22

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (2025) .......................................... 20, 21, 22, 23

Switgard Feuerstein, *Collusion in Industrial Economics—A Survey*, 5 J. Indus. Competition & Trade 163 (2005) .......................................................................11

William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Matthew E. Raiff, *Lessons for Competition Policy from the Vitamins Cartel*, *in* The Political Economy of Antitrust 149 (Vivek Ghoshal & John Stennek eds., 2007).............12

William H. Page, *The Role of Efficiency Evidence in Price-fixing Litigation*, 84 Antitrust L.J. 629 (2022) ....................................................................................11

Yuliya V. Bolotova, *Cartel Overcharges: An Empirical Analysis*, 70 J. Econ. Behav. & Org. 321 (2009) ..................................................................................11

**IDENTITIES AND INTEREST OF *AMICI CURIAE***

*Amici Curiae* are professors of law and economics who have researched and published extensively on antitrust issues. Though their work reflects a range of methodologies, they have a shared interest in ensuring that U.S. antitrust law is coherent and effective. They write to explain that this case presents an important opportunity for this Court to correct several troubling errors made by the District Court. *Amici* professors include both of the scholars whose research was cited by the District Court's summary judgment opinion. *See* Memorandum Opinion, *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. I)*, No. 1:07-mc-00489 (D.D.C. June 27, 2025), ECF No. 1267 ("MSJ Op.") at 40, 104, 105, 106, 108, 126 (citing a treatise by Professor Herbert Hovenkamp); *id.* at 44 (citing an article by Professor Christopher R. Leslie). The full list of *Amici Curiae* Antirust Law and Economics Professors is attached as Appendix A.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Sherman Act § 1's prohibition on harmful price-fixing agreements is a bedrock of U.S. antitrust law. Where direct evidence of collusion is available, it can satisfy the statute's requirement of proving an agreement. But cartel members usually take steps to conceal their agreements from public view. They often meet in nonpublic settings, avoid creating documents, alter evidence to appear benign, fabricate exculpatory documents, offer misleading explanations, and more. *See*

1

Christopher R. Leslie, *How to Hide a Price-Fixing Conspiracy: Denial, Deception, and Destruction of Evidence*, 2021 U. Ill. L. Rev. 1199, 1206–33 (2021) (collecting examples); *id.* at 1225 n.204 ("Cartels frequently utilized industry trade associations as covers for their illegal meetings, prepared false agendas and false minutes, and took many other steps to hide their conspiracies." (citing John M. Connor, Global Price Fixing 11 (2d ed. 2008)).

To ensure the Sherman Act can still effectively safeguard the public against harmful price-fixing, courts have long recognized proof of an agreement via circumstantial evidence. Evidence of parallel conduct, though not enough standing alone, can support finding an agreement when accompanied by relevant circumstantial evidence, often known as "plus factors." Circumstantial evidence thus provides an essential mechanism for identifying and addressing illegal collusion.

But recently, some courts have begun to depart from this common-sense approach. Christopher R. Leslie, *Antitrust's Interdependence Paradox*, 111 Va. L. Rev. 787, 799–804 (2025). Relying on a disproven assumption—that in concentrated markets mere interdependent, parallel conduct is equally or more attractive than an agreement—these courts have begun to reject well-established plus factors, thereby undermining antitrust law's ability to identify and address harmful price-fixing.

The District Court's opinion in this case rests heavily on this mistaken belief. Plaintiffs offered evidence of several plus factors, including rival-to-rival meetings and communications among senior executives about pricing, high market concentration, barriers to entry, inelastic demand, a common motive to conspire, extensive opportunities to reach and monitor an agreement, an abrupt change from past behavior, and more. *See* Plaintiffs' Memorandum in Opposition to Defendants' Joint and Individual Motions for Summary Judgment at 58–68, *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. I)*, No. 1:07-mc-00489 (D.D.C. Nov. 22, 2024), ECF No. 1229 ("Pl. MSJ Br."). Under existing precedent and in light of modern research on real-world cartels, that is more than enough evidence for a reasonable juror to infer an agreement. Yet the District Court repeatedly considered each type of evidence in a vacuum and rejected it based on the assumption that, because the markets at issue are highly concentrated, mere interdependence was equally or more likely than an illegal agreement. *See* MSJ Op. at 38, 99, 104, 135.

*Amici Curiae* write to explain that this assumption is fundamentally flawed. Modern economic principles and empirical research indicate that, in markets like the ones at issue in this case, price-fixing agreements are generally easier to initiate and manage, longer-lasting, and more profitable than mere interdependent conduct. This is why more actual, detected price-fixing conspiracies have occurred in

concentrated markets. *See* Leslie, *Antitrust's Interdependence Paradox*, *supra*, at 828–33. The District Court's "mere interdependence" assumption underestimates the attractiveness of agreements, and overestimates the ease and effectiveness of interdependence, in markets like the ones at issue here. If left uncorrected, this reasoning will effectively shield many of the most likely—and most harmful— price-fixing agreements from antitrust scrutiny.

The District Court's opinion made several critical errors. For brevity's sake, we focus on four. *First*, it rejected the use of relevant market-structure evidence, thereby making antitrust law paradoxically less suspicious of conduct in the markets where most price-fixing conspiracies occur. *Second*, for the same reason, the District Court rejected evidence of a common motive to conspire, another well-established plus factor that is more (not less) probative in such markets. *Third*, having incorrectly assumed that mere interdependence is easy and ubiquitous, the District Court discounted yet another well-recognized—and especially strong— plus factor: evidence of top-level executive communications among rivals about forward-looking pricing. MSJ Op. at 105–07. Worse yet, it held that such evidence is "more consistent with" mere interdependence than with an agreement. *Id.* at 152. In other words, evidence that rivals met together and discussed forward-looking pricing strategies tends to *dis*prove a price-fixing agreement—a clear error. *Fourth*, the opinion attempted to justify these errors by committing

another: it faulted this evidence for not being per se outcome-determinative. *Id.* at 105. That conclusion contravened the Supreme Court's instruction to consider circumstantial evidence in price-fixing cases "as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). In sum, relying on a faulty theory and departing from decades of precedent, the District Court prevented a claim from reaching a jury when more than enough evidence was present for a reasonable juror to infer a price-fixing agreement.

The Sherman Act has been in effect for 135 years. *Amici Curiae* believe it still has a critical role to play in the modern U.S. economy. Amidst widespread public concern over rising prices, that role remains as relevant today as it was in 1890. But the Sherman Act cannot serve as our nation's "Magna Carta of free enterprise," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972), if it turns a blind eye toward those markets in which vigilance is most needed. The District Court's opinion was wrongly decided. It is also emblematic of similar errors committed by some other lower courts. Left unchecked, these errors render antitrust law self-contradictory, undergirded by poor-quality guesswork, and unable to identify or halt many of the most harmful price-fixing agreements. *Amici Curiae* respectfully urge this Court to reverse course and ensure the continued effectiveness of this vitally important statute.

## I. THE DISTRICT COURT'S OPINION RELIED EXTENSIVELY ON THE "MERE INTERDEPENDENCE" FALLACY

Section 1 of the Sherman Act proscribes certain agreements in restraint of trade. 15 U.S.C. § 1. Among the very earliest agreements held to violate this statute were agreements among competitors to fix prices, and in particular price-fixing agreements among competing railroads. *See United States v. Joint Traffic Ass'n*, 171 U.S. 505 (1898); *United States v. Trans-Mo. Freight Ass'n*, 166 U.S. 290 (1897). Simple parallel conduct, without more, is not an agreement. *See Theatre Enters. v. Paramount Distrib'g*, 346 U.S. 537, 541 (1954). But courts have long recognized the need for plaintiffs to be able to demonstrate the requisite agreement via circumstantial evidence. *See, e.g.*, *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 142 (1948); *Interstate Cir., Inc. v. United States*, 306 U.S. 208, 226–27 (1938). In modern antitrust cases, the recognized types of relevant circumstantial evidence are generally referred to as "plus factors." *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 58 (D.D.C. 2016).

Some lower courts have recently begun to deviate from this long-established approach. Their reasoning rests not on new guidance from the Supreme Court or Congress, but rather on a disproven assumption: that in a concentrated market, engaging in mere interdependent conduct is equally or more attractive than entering into an agreement. These opinions are markedly less suspicious of

conduct in concentrated markets and more likely to "improperly discount[] factual evidence of collusion." Leslie, *Antitrust's Interdependence Paradox*, *supra*, at 799 (observing that these decisions "convert[] . . . interdependence theory into an almost insurmountable barrier for antitrust plaintiffs").

That is exactly what the District Court has done here. Its opinion correctly stated that "plaintiffs may use circumstantial evidence to show an inference of independent action is less persuasive than one of conspiracy by demonstrating parallel conduct buttressed by certain 'plus factors,' such as a motive to conspire, actions against self-interest, and other evidence implying a traditional conspiracy." MSJ Op. at 38. But then it backtracked: "Some of those factors, however, may be equally consistent with lawful interdependence and thus not add anything to the parallel conduct in aid of an inference of conspiracy." *Id.* In other words, these plus factors are not plus factors.

Based on the assumption that "[c]onscious parallelism is . . . a 'necessary fact of life in oligopolies,'" *id.* (quoting *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (3d Cir. 2015)), the District Court went on to hold that multiple long-established plus factors are no longer valid. It disregarded evidence of high concentration, barriers to entry, and inelastic demand, as well as evidence of a common motive to conspire. With mere interdependence as its baseline assumption, the District Court deemed it "equally or more plausible" that these

plus factors point toward mere interdependence, not toward an agreement. *Id.* at 39 (quoting *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1310 (11th Cir. 2003)).  And the District Court held that evidence of rival-to-rival meetings and communications about pricing is "*more* consistent with" mere interdependence than with an agreement. *Id.* at 152 (emphasis added).  The "mere interdependence" assumption runs throughout the District Court's opinion, and motivated its conclusion that multiple commonly recognized, well-established plus factors are no longer plus factors at all.

## II.    THE "MERE INTERDEPENDENCE" FALLACY RELIES ON DISPROVEN ASSUMPTIONS

The assumption that mere conscious parallelism is equally or more attractive than an agreement in concentrated markets is just that—an assumption.  Modern economic principles and empirical evidence indicate that it is wrong.  When applied by courts, it results in an antitrust paradox: the Sherman Act retreats as markets become more highly concentrated, even though concentrated markets are more likely to facilitate illegal price-fixing agreements.  A course correction is needed to restore coherence and effectiveness to antitrust.

### A.    Mere Interdependence Is Generally More Risky and Potentially Costly to Initiate, and More Difficult and Costly to Manage, Than an Agreement in These Markets

The District Court's opinion relies heavily on the assumption that conscious parallelism is a ubiquitous—indeed, a "necessary"—fact of life in highly

concentrated markets.  But market participants often face substantial challenges trying to coordinate prices using mere interdependence.  In practice, firms rarely, if ever, have identical cost structures, and prices are often not fully transparent.  This makes an interdependent, coordinated follow-the-leader strategy less workable.  *See* Leslie, *Antitrust's Interdependence Paradox*, *supra*, at 828–29; *see also* Pl. MSJ Br. at 86 (pointing to evidence that Defendants face different internal costs).  And such strategies require a leader, yet an unsuccessful first mover will lose business to its rivals and goodwill with its customers.  As a result, "even in highly concentrated markets, a unilateral price hike might be too risky to make without advance agreement."  *In re Coordinated Pretrial Procs. in Petrol. Prods. Antitrust Litig.*, 906 F.2d 432, 444 (9th Cir. 1990).

Moreover, a successful joint price-raising strategy typically requires a mechanism for detecting and deterring participants from "cheating" on each other by deviating from the collective goal.  Absent an agreement, this is often quite difficult.  *See* Leslie, *Antitrust's Interdependence Paradox*, *supra*, at 829; *see also* *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227–28 (1993) ("The signals are subject to misinterpretation and are a blunt and imprecise means of ensuring smooth cooperation, especially in the context of changing or unprecedented market circumstances.").  Here, it would require the ability to detect and discipline any competition on the basis of fuel surcharges—offering discounts,

not requiring surcharges, not enforcing or waiving a surcharge, etc.—all without an agreement.  Moreover, customers often try to defeat attempted price hikes by hinting at (or even lying about) lower price offers and secret discounts to play one supplier against another.  *See* Christopher R. Leslie, *Trust, Distrust, and Antitrust*, 82 Tex. L. Rev. 515, 635–36 (2004).  Absent an agreement and ongoing rival-to-rival communications, would-be price hikers have less ability to detect or prevent this.  *See id.*  The upshot is that, contrary to the District Court's baseline assumption, "a stable interdependent equilibrium is much harder to achieve and sustain than a collusive equilibrium."  Leslie, *Antitrust's Interdependence Paradox*, *supra*, at 831.  An agreement can solve these problems.

B.     **Agreements Are Easier to Initiate, Manage, and Conceal, and Are More Profitable and Longer-Lasting, in Concentrated Markets**

Market concentration tends to facilitate collusive agreements for a variety of long-understood reasons.  *See, e.g.*, *Gainesville Utils. Dep't v. Fla. Power & Light Co.*, 573 F.2d 292, 303 (5th Cir. 1978) ("Economists recognize that when a market is concentrated it is easier to coordinate collusive behavior."); George A. Hay & Daniel Kelley, *An Empirical Survey of Price-Fixing Conspiracies*, 17 J. L. & Econ. 13, 23 (1974) ("[C]oncentration is an important determinant of the ability of firms to collude.").  Reaching and monitoring compliance with an agreement are both easier when fewer stakeholders are involved.  *See In re Interior Molded Doors Antitrust Litig.*, Nos. 3:18-cv-00718, 3:18-cv-00850, 2019 U.S. Dist. LEXIS

161045, at *19 (E.D. Va. Sept. 18, 2019); Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813, 825–34 (2011). A concentrated market also makes it easier to keep an agreement hidden from the public. *See Gainesville Utils.*, 573 F.2d at 303.

Market concentration also tends to increase the potential reward from entering a collusive agreement. Cartel overcharges are positively correlated with market concentration: the more highly concentrated the market, the higher the excess profits from collusive agreements tend to be. Yuliya V. Bolotova, *Cartel Overcharges: An Empirical Analysis*, 70 J. Econ. Behav. & Org. 321, 338 (2009) ("Overcharges tend to be higher in the markets where cartels have high market shares and the number of cartel participants is small."). And detected cartel agreements tend to last longer in concentrated markets than in unconcentrated ones. *See* Switgard Feuerstein, *Collusion in Industrial Economics—A Survey*, 5 J. Indus. Competition & Trade 163, 184 (2005). All of this makes agreements more, not equally or less, likely in highly concentrated markets.

### C.   Even Firms in More Highly Concentrated Markets Than These Have Opted for Agreements Instead of Mere Interdependence

Even firms in markets with only a handful of participants have chosen agreements, rather than trying to coordinate their conduct with no agreement on how to do so. *See* William H. Page, *The Role of Efficiency Evidence in Price-fixing Litigation*, 84 Antitrust L.J. 629, 648 (2022) ("[M]ost durable cartels have

occurred in highly concentrated markets, so express conspiracy must often be necessary to coordinate pricing effectively, even in oligopolies."). For example, in the 1990s, cartel members agreed to fix prices on a number of vitamins. Some of the affected markets had as few as four, three, or even just two producers. *See* William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Matthew E. Raiff, *Lessons for Competition Policy from the Vitamins Cartel*, *in* The Political Economy of Antitrust 149, 156–61 (Vivek Ghoshal & John Stennek eds., 2007).

Using the District Court's "mere interdependence" assumption, coordinating without an agreement should have been especially easy and attractive in these markets, some of which were even more highly concentrated than the ones at issue in this case. But these producers chose instead to conspire via agreements, even despite the added risk of antitrust liability. Kovacic et al., *supra*, at 156.

Tellingly, after the vitamin suppliers in four-firm settings—like the railroad industry here—entered into plea deals with prosecutors and presumably halted their agreements, market prices fell sharply. *See id.* at 166. Prices fell even in duopoly markets with only two suppliers. *Id. See generally* John M. Connor, *Price-Fixing Overcharges: Legal and Economic Evidence* 39, Am. Antitrust Inst. Working Paper No. 04-05 (2004) (finding that "pricing discipline often breaks down" during periods without agreements). In these highly concentrated markets,

mere interdependence was not as effective at maintaining elevated price levels as the prohibited agreements had been.

Although coordination via mere interdependence can and does happen, it is not a "necessary fact of life." Economic theory, empirical research, and real-world experience all indicate that market concentration, barriers to entry, and inelastic demand make collusive agreements more attractive—both in general and as compared to relying on mere interdependence. This is why most identified real-world price-fixing agreements have occurred in concentrated markets.

## III. THE DISTRICT COURT COMMITTED MULTIPLE REVERSIBLE ERRORS

*Amici Curiae* respectfully urge this Court to reverse the opinion below on four grounds. *First*, it was reversible error to hold that evidence of high market concentration, entry barriers, and demand inelasticity is irrelevant to Sherman Act agreement analysis. *Second*, it was reversible error to hold that evidence of a common motive to conspire, including a history of price wars, declining industry revenues, and difficulty imposing price hikes unilaterally, is irrelevant to the agreement inquiry. *Third*, it was reversible error to discount evidence of executive-level, rival-to-rival communications about forward-looking pricing strategies— and, worse yet, to hold that such evidence tends to *dis*prove an agreement. *Fourth*, it was reversible error to hold, in the alternative, that such evidence cannot support

an agreement because it is not *per se* outcome-determinative when severed from

the rest of the evidence.

A.  **It Was Error to Hold That High Market Concentration, Entry Barriers, and Demand Inelasticity Are Irrelevant to the Agreement Inquiry**

Courts have long treated concentrated market structures as a probative plus

factor, in line with the consensus among economic and legal scholars. *See, e.g.*,

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015), *as*

*amended on reh'g in part*, No. 14-1746, 2015 U.S. App. LEXIS 16412, at *39–40

(4th Cir. Sep. 15, 2015); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d

33, 48 (1st Cir. 2013); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627–28

(7th Cir. 2010) (Posner, J.); *Todd v. Exxon Corp.*, 275 F.3d 191, 208–09 (2d Cir.

2001) (Sotomayor, J.); *In re Granulated Sugar Antitrust Litig.*, MDL No. 24-3110

(JWB/DTS), 2025 U.S. Dist. LEXIS 21417, at *31–32 (D. Minn. Oct. 15, 2025);

*In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CM-27241, 2025 U.S. Dist.

LEXIS 167372, at *43–44 (E.D. Pa. Aug. 27, 2025); *Team Cam, LLC v. Reliable*

*Contracting Co.*, No. CV 24-1545-TDC, 2025 U.S. Dist. LEXIS 65221, at *28–30

(D. Md. Apr. 4, 2025); *Crownalytics, LLC v. SPINS LLC*, No. 22-CV-01275-NYW-

JPO, 2024 U.S. Dist. LEXIS 85478, at *23–24 (D. Colo. May 10, 2024); *JSW Steel*

*(USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 596 (S.D. Tex. 2022), *aff'd per*

*curiam*, No. 22-20149, 2025 U.S. App. LEXIS 6204 (5th Cir. Mar. 17, 2025); *In re*

*Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 U.S. Dist. LEXIS 208215, at

*22–23 (N.D. Ill. Nov. 6, 2020); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp.

3d 750, 772 (E.D. Pa. 2017); *Park Irmat Drug Corp. v. Express Scripts Holding

Co.*, 310 F. Supp. 3d 1002, 1013–14 (E.D. Mo. 2018), *aff'd*, 911 F.3d 505 (8th Cir.

2018); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 716 (S.D.N.Y.

2017); *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, No. 1:09-CV-00560,

2013 U.S. Dist. LEXIS 21744, at *29, *31 (E.D. Cal. Feb. 15, 2013), *aff'd*, 803

F.3d 1084 (9th Cir. 2015); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F.

Supp. 2d 696, 711 (E.D. La. 2013); *In re Plasma-Derivative Protein Therapies

Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 (N.D. Ill. 2011); Leslie, *Antitrust's

Interdependence Paradox*, *supra*, at 798; Arthur G. Fraas & Douglas F. Greer,

*Market Structure and Price Collusion: An Empirical Analysis*, 26 J. Indus. Econ.

21, 23–24 (1977); Hay & Kelley, *supra*, at 20–24.

 The District Court below decided to take the opposite view.  One of several

plus factors Plaintiffs point to is a highly concentrated market, protected by

unusually high entry barriers, with high demand inelasticity.  *See* Pl. MSJ Br. at

66–67.  In response, the District Court's opinion posited that "these characteristics

are just as consistent with conscious parallelism" as with an agreement.  MSJ Op.

at 145.  Moreover, the District Court reasoned, "these features . . . existed prior to

the conspiracy period, yet did not result—according to plaintiffs—in conspiratorial conduct then." *Id.* at 146.

The recent impulse by some courts, including the District Court here, to disregard market-structure evidence has no legal basis. Instead, as explained *supra*, it rests on a disproven assumption that breaks down upon examination. Modern economic principles and empirical research indicate that "a stable [mere-]interdependent equilibrium is much harder to achieve and sustain than a collusive equilibrium." Leslie, *Antitrust's Interdependence Paradox*, *supra*, at 831. The ability to coordinate via mere interdependence in a concentrated market is not a given or necessary fact of life. High market concentration, entry barriers, and demand inelasticity tend to make agreements easier to form, easier to enforce, longer-lasting, and more profitable than mere interdependence.

The District Court compounded this error by discounting market-structure evidence because it "existed prior to the conspiracy period." MSJ Op. at 146. Respectfully, this fundamentally misunderstands both the law and the economics. Market features that tend to facilitate collusion are relevant because they can facilitate collusion—that is, they are relevant precisely *because* they "exist[] prior" to a collusive agreement.

*Amici Curiae* respectfully urge this Court to avoid the "mere interdependence" fallacy and restore common sense to antitrust doctrine. Evidence

of a market structure conducive to collusion is, and should be, one of the plus

factors relevant to the agreement inquiry.

### B. It Was Error to Hold That a Common Motive to Conspire Is Irrelevant to the Agreement Inquiry

Common motive to conspire is another long-recognized plus factor in

Sherman Act § 1 cases. *See, e.g.*, *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*,

156 F.4th 68, 84 (2d Cir. 2025); *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d

Cir. 2015); *Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013);

*Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 858–59 (10th Cir. 1999); *Re/Max Int'l,*

*Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999); *In re Pork Antitrust*

*Litig.*, 781 F. Supp. 3d 758, 818 (D. Minn. 2025); *In re Manufactured Home Lot*

*Rents Antitrust Litig.*, No. 23-CV-06715, 2025 U.S. Dist. LEXIS 250374, at *28

(N.D. Ill. Dec. 4, 2025); *In re Realpage, Inc., Rental Software Antitrust Litig. (No.*

*II)*, No. 3:23-MD-03071, 2025 WL 3257456, at *16 (M.D. Tenn. Nov. 21, 2025);

*In re Disposable Contact Lens Antitrust Litig.*, 739 F. Supp. 3d 1118, 1124 (M.D.

Fla. 2024); *Flannery Assocs. LLC v. Barnes Fam. Ranch Assocs., LLC*, 727 F.

Supp. 3d 895, 912 (E.D. Cal. 2024); *Othart Dairy Farms, LLC v. Dairy Farmers of*

*Am., Inc.*, 720 F. Supp. 3d 1087, 1108 (D.N.M. 2024); *B & R Supermarket, Inc. v.*

*Visa Inc.*, No. 17-CV-2738 (MKB), 2024 U.S. Dist. LEXIS 175982, at *40

(E.D.N.Y. Sep. 25, 2024); *Greco v. Mallouk*, No. 22 C 2661, 2024 U.S. Dist.

LEXIS 161475, at *17 (N.D. Ill. Sept. 9, 2024); *In re Outpatient Med. Ctr. Emps.*

*Antitrust Litig.*, 630 F. Supp. 3d 968, 985 (N.D. Ill. 2022); Christopher R. Leslie, *The Factor/Element Distinction in Antitrust Litigation*, 64 Wm. & Mary L. Rev. 585, 598 (2023) ("[C]ourts routinely ask about the motive and opportunity to conspire . . . ."); Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. U. L. Rev. 1581, 1595 (2021).

The District Court again decided to take the opposite view, again based on the mere-interdependence fallacy. MSJ Op. at 104. Plaintiffs pointed to an industry history of (in Defendants' own words) "very vicious historical price wars," declining industry revenues, and competitive constraints on Defendants' ability to hike prices via fuel surcharges when acting unilaterally. Pl. MSJ Br. at 61. This historical context tended to give Defendants an incentive to agree on imposing across-the-board fuel surcharges. The District Court, however, disregarded this evidence based on the assumption that it was equally or more likely to point toward "'interdependence' among oligopolists" than toward an agreement. MSJ Op. at 104 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)).

This doubled down on the District Court's first error. Evidence of price wars, declining revenues, and difficulty raising prices unilaterally is not consistent with the District Court's baseline assumption that "[c]onscious parallelism is . . . a 'necessary fact of life in oligopolies.'" MSJ Op. at 38 (quoting *Chocolate*, 801

F.3d at 397). Such evidence tends to show that coordinating via mere interdependence was neither easy nor effective—and certainly not a necessary fact of life.

A common motive to conspire is, even on its own, relevant to the agreement inquiry. Moreover, it "reinforce[s] the probative value of market concentration." Leslie, *Antitrust's Interdependence Paradox*, *supra*, at 835. Even if the market structure were equally or more consistent with mere interdependence (which it is not), the presence of a common motive to conspire tends to make the "mere interdependence" hypothesis less likely—and the market-structure evidence correspondingly more probative. The District Court instead analyzed the common-motive evidence in isolation from market-structure evidence, violating the Supreme Court's mandate to view circumstantial evidence of collusive agreements "as a whole." *Cont'l Ore Co.*, 370 U.S. at 699.

### C. It Was Error to Hold That Rival-to-Rival Communications About Pricing Strategies Are Irrelevant to the Agreement Inquiry

Courts have long recognized that interfirm, rival-to-rival communications are probative as to the agreement inquiry. *See, e.g.*, *Mosaic Health, Inc.*, 156 F.4th at 84; *Manufactured Home Lot Rents Antitrust Litig.*, 2025 U.S. Dist. LEXIS 250374 at *28–30; *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 U.S. Dist. LEXIS 22329, at *24 (D. Conn. Feb. 7, 2025); *Crownalytics,* 2024 U.S. Dist. LEXIS 85478 at *18; *O.E.M. Glass Network, Inc. v.*

*Mygrant Glass Co., Inc.*, No. 19-CV-00742 (NGG) (LB), 2023 U.S. Dist. LEXIS

45497, at *40 (E.D.N.Y. Mar. 10, 2023); *Borozny v. Raytheon Techs. Corp.*, No.

3:21-CV-1657-SVN, 2023 U.S. Dist. LEXIS 9914, at *56 (D. Conn. Jan. 20,

2023); *Outpatient Med. Ctr. Emps.*, 630 F. Supp. 3d at 985; *Iowa Pub. Emps.' Ret.

Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 322

(S.D.N.Y. 2018); *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968,

983 (N.D. Ohio 2015); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law:

An Analysis of Antitrust Principles and Their Application ¶ 308f (2025); Leslie,

*Antitrust's Interdependence Paradox*, *supra*, at 816; Leslie, *Probative Synergy*,

*supra*, at 1584.

Rival-to-rival communications tend to show not only an opportunity to

agree, but also a mechanism for monitoring, adjusting, and continuing to abide by

an agreement.  And communications like the ones at issue in this case—discussions

about forward-looking pricing strategies among top-level executives with pricing

authority—go well beyond that.  *See, e.g.*, *City of Philadelphia v. Bank of Am.*

*Corp.*, 498 F. Supp. 3d 516, 529 (S.D.N.Y. 2020) (emphasizing the "forward-

looking, price-bearing" nature of defendants' interfirm communications); Pl. MSJ

Br. at 21 (Norfolk Southern's director of marketing systems received

communication from Union Pacific that "[i]t sounds like UP will adopt the CSXT

fuel surcharge" and expressed "expect[ation] that'll push us over the top as well"

(citing PX0912, NS_062203025, at '025)); *id.* (same Norfolk Southern director "reported [to a Norfolk Southern executive] talking with CSX 'privately'" about CSX's future fuel-surcharge pricing strategy (citing DA05709, at '710)). Indeed, some of Plaintiffs' evidence in this case verges on *direct* evidence of an agreement. *See, e.g.*, Pl. MSJ Br. at 26 (handwritten notes from meeting between Norfolk Southern and Union Pacific executives reflecting an agreement that, as to "[f]uel surcharges: [u]niform application across the industry would be helpful" (citing COF ¶¶ 182, 522; PX0460, UPFSC 0616651, at '652)).

Nonetheless, the District Court discounted rival-to-rival communications as a plus factor. It began by suggesting that such evidence shows only "opportunity to conspire." MSJ Op. at 105 (quoting *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940, 2009 U.S. Dist. LEXIS 123954, at *30 (D.D.C. Sep. 30, 2009)). As a result, the District Court concluded this evidence "should be accorded little, if any weight." *Id.* (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir. 1999)). To support this holding, the District Court invoked concerns about accidentally condemning "procompetitive collaborations," *id.* (quoting Areeda & Hovenkamp, *supra*, ¶ 1417b), and innocent "social discourse," *id.* (quoting *Baby Food*, 166 F.3d at 133).

Holding that evidence of rival-to-rival communications has "little, if any" value was deeply mistaken. Evidence of executive-level, rival-to-rival

communications about forward-looking, price-related strategies is among the very strongest—not weakest—circumstantial evidence of an agreement. *See, e.g.*, *Gainesville Utils.*, 573 F.2d at 300–01 (holding that parallel conduct and inter-firm communications compelled finding an agreement); Leslie, *Probative Synergy*, *supra*, at 1595 ("Evidence of interfirm messages and conversations can be powerful circumstantial evidence of collusion . . . ."); Louis Kaplow, *Direct Versus Communications-Based Prohibitions on Price Fixing*, 3 J. Legal Analysis 449, 471–72 (2011) ("Interfirm communications . . . when documented and specific . . . are often excellent evidence."); Kai-Uwe Kühn, *Fighting Collusion by Regulating Communication Between Firms*, 16 Econ. Pol'y 169, 180 (2001) ("The activities that seem to be most closely associated with collusion tend to centre around communication.").[1]

While erstwhile competitors do sometimes engage in "procompetitive collaborations," MSJ Op. at 105 (quoting Areeda & Hovenkamp, *supra*, ¶ 1417b), a reasonable juror could find here that Defendants' senior executives had no need to discuss forward-looking fuel-surcharge pricing, and that their discussions were

---

[1] Experimental studies further confirm the importance of this factor. Simply introducing the ability of rivals to communicate with each other can flip market behavior from highly competitive to highly cartelized, yielding higher prices and shared monopoly profits. *See* Peter C. Carstensen & Annkathrin Marschall, *Pooling and Exchanging Competitively Sensitive Information Among Rivals*, 92 U. Cin. L. Rev. 335, 353–54 (2023) (collecting sources).

not limited to collaborative shipments. *See* Pl. MSJ Br. at 28, 45–46. The District

Court's reliance on Professors Areeda and Hovenkamp's general statement about

"procompetitive collaboration" to justify discounting this evidence was misguided.

*See* Areeda & Hovenkamp, *supra*, ¶ 308f ("[E]vidence that competitors discussed

selling prices . . . is not mere evidence of conscious parallelism, it is circumstantial

evidence of an actual agreement.").

And while employees of competing firms do sometimes engage in "social

discourse," MSJ Op. at 105 (quoting *Baby Food*, 166 F.3d at 133), there is an

obvious difference between, say, discussing sports or weather and the kinds of

communications Plaintiffs identify in this case. *Cf. City of Philadelphia*, 498 F.

Supp. 3d at 529 (distinguishing between "innocuous communications" and "the

kinds of forward-looking, price-bearing communications that can support an

inference").

Given the nature of the communicators here—top-level executives with

pricing authority—the District Court's disregard for this evidence was particularly

concerning. Evidence of executive-level communications among rivals is

"particularly strong." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 67 (2d Cir.

2012). And the District Court's reliance on the Third Circuit's *Baby Food*

decision, *see* MSJ Op. at 105, was particularly misguided. As the Third Circuit

itself has explained, *Baby Food* addressed only "[e]vidence of sporadic exchanges

of shop talk among field sales representatives who lack[ed] pricing authority," to be distinguished from the "far different situation where upper-level executives have secret conversations about price." *Flat Glass*, 385 F.3d at 368–69.[2]

More troubling still, Plaintiffs point to evidence that Defendants took steps to "sanitize[] meeting minutes," Pl. MSJ Br. at 29, and attended joint meetings and discussed topics that one Defendant internally warned would violate antitrust laws, *id.* at 32. Altering potentially inculpatory evidence is one of the hallmarks of a collusive agreement. *See* Leslie, *How to Hide a Price-Fixing Conspiracy*, *supra*, at 1225 n. 204 ("Cartels frequently . . . prepared false agendas and false minutes, and took many other steps to hide their conspiracies." (quoting Connor, *supra*, at 11)).

## D. It Was Error to View Highly Probative Evidence in a Vacuum, Divorced from Relevant Context

Conceding that rival-to-rival "discussions of pricing may be more probative than mere opportunities to conspire," MSJ Op. at 105, the District Court went on to

---

[2] The District Court sought to buttress its reasoning by pointing out that Defendants also "frequently shared pricing and coverage information in legitimate fora, . . . [which] particularly supports [mere] conscious parallelism." MSJ Op. at 146. But the presence of public statements about pricing and coverage does not, and should not, provide an exculpatory mechanism for defendants. Such statements can be a means of facilitating an ongoing agreement. And whatever their probative value in cases that lack evidence of private communications and meetings, such evidence is present here. Left uncorrected, the District Court's holding would create a roadmap for future cartels to escape liability by simply making public announcements about pricing.

hold that "such discussions are still *not themselves sufficient* to establish conspiracy," *id.* (emphasis added). This was another clear, reversible error. The Supreme Court has admonished against "dismembering" the corpus of evidence "and viewing its separate parts" instead of "looking at it as a whole." *Cont'l Ore Co.*, 370 U.S. at 699. Following that instruction, "'[p]lus factors' must be evaluated holistically." *Domestic Airline Travel*, 221 F. Supp. 3d at 58 (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015)); *see also*, *e.g.*, *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 510 (M.D. Tenn. 2023) ("The Court must assess plus factors holistically."); *Pork*, 781 F. Supp. at 829 ("[A]t summary judgment in an antitrust case, the Court's job is not to separate wheat from chaff on every single plus factor and allegation of parallel conduct in isolation. The Court must instead evaluate the evidence in its totality . . . .").

This principle is bedrock antitrust law, as the District Court itself noted. *See* MSJ Op. at 40 (stating that "a 'court must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence'" (quoting *Flat Glass*, 385 F.3d at 369)). After considering and rejecting the evidence discussed above in admittedly "piecemeal" fashion, *id.* at 149, the District Court held in the alternative that a purportedly holistic analysis still warranted summary judgment, *id.* at 149–52. That analysis comprised narrowing the body of evidence

to "general market factors," a "few meetings," and "sporadic" rival-to-rival communications, which the District Court held were "at least as consistent with—in fact, *more consistent with*—interdependent conduct than a conspiracy." *Id.* at 152 (emphasis added).

As to the market-structure evidence, the District Court's opinion simply repeated the "mere interdependence" fallacy. As to the evidence of rival-to-rival meetings and communications, the opinion did not attempt to explain or justify its holding that this evidence is "more consistent with" lack of an agreement than with an agreement. Nor could it have. The opposite is true. Mere interdependence avoids the need for interfirm meetings or communications. That is what makes it mere interdependence.

The District Court's purportedly holistic analysis also failed to address the content of the rivals' discussions (forward-looking pricing strategies, rather than innocuous social discussions or procompetitive collaborations) and the nature of the discussants (top-level senior executives with pricing authority, rather than low-level employees).

A true holistic analysis would, in compliance with the Supreme Court's instruction, consider how different types of evidence interact with each other. Even if the market-structure evidence were equally or more consistent with mere interdependence (which it is not), evidence of nonpublic meetings and

communications among rival senior executives about pricing makes the "mere interdependence" hypothesis significantly less likely. The rival-to-rival communication evidence makes the market-structure evidence more probative. The same is true as to common-motive evidence, which the District Court discarded in a vacuum and did not revisit at all during its purportedly holistic analysis. A history of price wars, declining industry revenues, and competitive constraints on unilateral price increases makes "mere interdependence" less likely still. As a result, it further increases the probative value of the market-structure and rival-to-rival communications evidence. A proper holistic analysis would also take into account both the subject of the communications (forward-looking pricing strategies) and the identity of communicators (senior executives with pricing authority).

Perhaps the District Court simply desired to dispose of this protracted litigation. But on this record, more than enough evidence exists for a reasonable juror to infer an agreement. Where Plaintiffs can point to parallel conduct and evidence of top-level meetings and communications among rivals about forward-looking pricing strategies, high market concentration, barriers to entry, inelastic demand, a common motive to conspire, and more, summary judgment is inappropriate. This case should be decided after a trial, where a fact-finder will have the chance to assess witnesses' credibility first-hand, follow the Supreme

Court's instruction to consider the evidence holistically, and decide whether an illegal price-fixing agreement has occurred.

## CONCLUSION

This case presents this Court with an important opportunity. The opinion below rests on a mistaken belief shared by some other lower courts. It is well-understood that "'circumstantial evidence is the lifeblood of antitrust law' because direct evidence will rarely be available to prove the existence of a price-fixing conspiracy." *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 749 (N.D. Ill. 2019) (quoting *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973)). Yet some courts have, like the District Court here, departed from precedent and economic learning to discredit and disregard highly relevant circumstantial evidence. *See* Christopher R. Leslie, *The Decline and Fall of Circumstantial Evidence in Antitrust Law*, 69 Am. U. L. Rev. 1713, 1718 (2020) ("[J]udicial hostility to circumstantial evidence is causing a state of decline in the effectiveness of antitrust law's ability to combat collusion. Unless federal judges recognize and arrest this problematic trend, courts will invite a new wave of price fixing."). If antitrust law cannot effectively identify and address harmful price-fixing agreements, American consumers, suppliers, and workers will suffer the consequences. *Amici Curiae* respectfully urge this Court to reverse course and restore the Sherman Act to its intended role.

Dated: December 19, 2025                    Respectfully Submitted,

                                            */s/ Victoria Sims*
                                            Victoria Sims
                                            **SIMONSEN SUSSMAN LLP**
                                            1629 K Street NW, Suite 300
                                            Washington, DC 20006
                                            (202) 751-5441
                                            victoria.sims@simonsensussman.com

                                            *Counsel for Amici Curiae Antitrust Law
                                            and Economics Professors*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 6456 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman. I certify that this brief is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5).

Dated:  December  19, 2025

/s/ *Victoria Sims*
  Victoria Sims

# APPENDIX A

## List of *Amici Curiae* Antitrust Law and Economics Professors

Laura Alexander
Assistant Professor
The Ohio State University Moritz College of Law

Roger P. Alford
Professor of Law
University of Notre Dame Law School

Rebecca Haw Allensworth
David Daniels Allen Professor of Law
Vanderbilt Law School

Christine P. Bartholomew
Professor of Law & Vice Dean for Student Achievement
University of Buffalo School of Law

Joseph P. Bauer
Professor of Law Emeritus
University of Notre Dame Law School

Elettra Bietti
Assistant Professor of Law & Computer Science
Northeastern University School of Law & Khoury College of Computer Sciences

Darren Bush
Leonard B. Rosenberg Professor of Law
University of Houston Law Center

Michael A. Carrier
Board of Governors Professor of Law
Rutgers Law School

Peter C. Carstensen
Fred W. & Vi Miller Chair in Law Emeritus
University of Wisconsin Law School

Andrew Chin
Paul B. Eaton Distinguished Professor of Law
University of North Carolina School of Law

Gregory Day
Associate Professor
University of Georgia Terry College of Business

Javier Donna
Associate Professor of Economics
University of Miami Herbert Business School

Erika Douglas
Associate Professor of Law
Temple University Beasley School of Law

Harry First
Charles L. Denison Professor of Law Emeritus
New York University School of Law

David J. Gerber
University Distinguished Professor Emeritus
Chicago-Kent College of Law, IIT

Shubha Ghosh
Crandall Melvin Professor of Law
Syracuse University College of Law

Mark Glick
Professor of Economics
University of Utah Department of Economics

Nikolas Guggenberger
Assistant Professor
University of Houston Law Center

Hiba Hafiz
Associate Professor & McHale Faculty Research Scholar
Boston College Law School

Erik Hovenkamp
Professor of Law
Cornell Law School

Herbert Hovenkamp
James G. Dinan University Professor
University of Pennsylvania Carey Law School & Wharton School

Michael J. Hutter
Professor of Law
Albany Law School

John B. Kirkwood
William C. Oltman Professor of Teaching Excellence
Seattle University School of Law

John Kwoka
Neal F. Finnegan Distinguished Professor of Economics
Northeastern University Department of Economics

Robert H. Lande
Venable Professor of Law Emeritus
University of Baltimore School of Law

Filippo Lancieri
Associate Professor of Law
Georgetown University Law Center

Mark Lemley
William H. Neukom Professor of Law
Stanford Law School

Christopher Leslie
Chancellor's Professor of Law
UC Irvine School of Law

Salil Mehra
James E. Beasley Professor of Law
Temple University Beasley School of Law

A. Douglas Melamed
Visiting Fellow
Stanford Law School

John M. Newman
Herff Chair of Excellence
University of Memphis School of Law

Menesh Patel
Professor of Law
UC Davis School of Law

Daniel Rubinfeld
Professor of Law Emeritus
New York University School of Law
Robert L. Bridges Professor of Law Emeritus & Professor of Economics Emeritus
University of California, Berkeley

Christopher L. Sagers
James A. Thomas Distinguished Professor of Law
Cleveland State University College of Law

Laura Phillips-Sawyer
Jane W. Wilson Associate Professor in Business Law
University of Georgia School of Law

Christopher Jon Sprigman
Murray & Kathleen Bring Professor of Law
New York University School of Law

Theodosia Stavroulaki
Assistant Professor
Saint Louis University School of Law

Jennifer Sturiale
Associate Professor of Law
Widener University Delaware Law School

Avishalom Tor
Professor of Law
University of Notre Dame Law School

Spencer Weber Waller
John Paul Stevens Chair in Competition Law
Loyola University Chicago School of Law

Samuel N. Weinstein
Professor of Law
Cardozo School of Law

**CERTIFICATE OF SERVICE**

I, Victoria Sims, certify that on December 19, 2025, the foregoing

document was filed with the Clerk of the Court for the United States Court of

Appeals for the D.C. Circuit and served on all parties or their counsel of record

through the CM/ECF system.


Dated:  December  19, 2025


                                       /s/ *Victoria Sims*
                                        Victoria Sims