NOT YET SCHEDULED FOR ORAL ARGUMENT

———————————

Nos. 25-7103, 25-7104, 25-7105, 25-7107, 25-7108

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

IN RE: RAIL FREIGHT FUEL SURCHARGE
ANTITRUST LITIGATION.

———————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

**BRIEF FOR THE DISTRICT OF COLUMBIA AND 22 STATES AS AMICI
CURIAE IN SUPPORT OF APPELLANTS**

———————————

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

AMBER D. GREENAWAY
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-5528
amber.greenaway@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

*A. Parties and amici*.—The parties and amici are listed in the certificates filed by the parties on September 2 and October 1, 2025, respectively. In addition, the following amici subsequently appeared in this case: Arizona, Colorado, Connecticut, Delaware, District of Columbia, Illinois, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Vermont, and Washington.

B. *Ruling under review*.—The rulings under review are listed in the certificates filed by the parties on September 2 and October 1, 2025, respectively.

C. *Related cases*.—All related cases are listed in the certificates filed by the parties on September 2 and October 1, 2025, respectively.

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI CURIAE ................................... 1

SUMMARY OF ARGUMENT ................................................................ 2

ARGUMENT ........................................................................................ 6

    I.    States Rely On Antitrust Laws To Address Anticompetitive Price Fixing And Safeguard Consumers. ....................................... 6

        A.    States play an important role in enforcing federal and state antitrust laws and have a vested interest in fair prices for freight rail services. ..................................................... 6

        B.    Due to increasing efforts by market participants to evade detection, states often rely on circumstantial evidence to prove concerted action. ........................................... 11

    II.    The District Court's Decision Is Incorrect And Threatens To Undermine Antitrust Enforcement Efforts. ......................................... 15

CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES*

*Cases*

*Abbott Lab'ys v. Higgins*,
  522 U.S. 1153 (1998) ........................................................................ 22

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994) ........................................................ 21, 24

*Anheuser Busch, Inc. v. Abrams*,
  520 N.E.2d 535 (N.Y. 1988) ............................................................. 8

*BanxCorp v. Bankrate Inc.*,
  No. 07-cv-3398, 2012 WL 3133786 (D.N.J. July 30, 2012) ............... 7

*Caller-Times Publ'g Co., Inc. v. Triad Commc'ns Inc.*,
  826 S.W.2d 576 (Tex. 1992) .............................................................. 8

*County of Tuolumne v. Sonora Cmty. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001) ....................................................... 7, 8

*District of Columbia v. Amazon.com, Inc.*,
  320 A.3d 1073 (D.C. 2024) ............................................................... 7

*District of Columbia v. RealPage, Inc.*,
  No. 2023-CAB-006762 (D.C. Super. Ct. filed Nov. 11, 2023) ........... 7

*Eastman Kodak Co. v. Image Tech Servs., Inc.*,
  504 U.S. 451 (1992) ................................................. 4, 5, 19, 20, 23

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
  94 F.3d 1032 (6th Cir. 1996) .......................................................... 22

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
  663 F.2d 253 (D.C. Cir. 1981) .................................................... 22, 23

*Georgia v. Pa. R.R. Co.*,
  324 U.S. 439 (1945) .......................................................................... 6

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*In Re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015) ............................................................... 18

*In re Rail Freight Fuel Surcharge Antitrust Litig. (No. I)*,
No. 11-CV-1049, 2025 WL 1784519 (D.D.C. June 27, 2025) ........................ 15

*In re Automotive Parts Antitrust Litigation*,
No. 12-MD-02311, 2014 WL 4272772 (E.D. Mich. Aug. 29, 2014) .............. 12

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) .................................................... 15, 17

*In re Brand Name Prescription Drugs Litig.*,
123 F.3d 599 (7th Cir. 1997) .................................................... 22

*In re Elec. Books Antitrust Litig.*,
No. 11-MD-2293, 2014 WL 2535112 (S.D.N.Y. June 5, 2014) ........................ 8

*In re Flat Glass Antitrust Litigation*,
385 F.3d 350 (3d Cir. 2004) .................................................... 16, 21, 24

*In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012) .................................................... 21

*InterVest, Inc. v. Bloomberg, L.P.*,
340 F.3d 144 (3d Cir. 2003) .................................................... 20, 24

*Maryland v. RealPage, Inc.*,
No. C-24-CV-25-003948 (Balt. City Cir. Ct., Md., filed Jan. 15, 2025) ............ 7

*\*Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .................................................... 4, 16, 19, 20, 21

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) .................................................... 23

*Multiflex, Inc. v. Samuel Moore & Co.*,
709 F.2d 980 (5th Cir. 1983) .................................................... 14

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
998 F.2d 1224 (3d Cir. 1993) .................................................... 20, 21, 24

*Platkin v. RealPage, Inc.*,
No. 2:25-cv-03057 (D.N.J. filed Apr. 23, 2025) ................................. 7

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.*,
392 F. Supp. 2d 118 (D.P.R. 2005) .................................................. 7

*St. Clair v. Citizens Fin. Grp.*,
340 F. App'x 62 (3d Cir. 2009) ....................................................... 8

*State v. Black*,
676 P.2d 963 (Wash. 1984) ............................................................. 8

*Superior Prod. P'ship v. Gordon Auto Body Parts Co.*,
784 F.3d 311 (6th Cir. 2015) ......................................................... 21

*Trane U.S. Inc. v. Meehan*,
563 F. Supp. 2d 743 (N.D. Ohio 2008) ............................................. 8

*United States v. Agri Stats, Inc.*,
No. 0:23-cv-03009 (D. Minn. filed Sept. 28, 2023) ........................... 6

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024) ............................................... 13, 14

*United States v. RealPage, Inc.*,
No. 1:24-cv-00710 (M.D.N.C. filed Aug. 23, 2024) ...................... 6, 7

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
873 F.3d 185 (3d Cir. 2017) ......................................................... 18


*Statutes, Rules, and Regulations*

15 U.S.C. § 15c ................................................................... 1, 6

28 U.S.C. § 1407 ................................................................... 6

D.C. Code § 28-4515 ................................................................ 8

Fed. R. Civ. P. 56 ............................................................. 5, 24

N.H. Rev. Stat. Ann. § 356:14 ................................................... 8

N.J. Stat. Ann. § 56:9-18 .......................................................... 8

Tex. Bus. & Com. Code § 15.04 ............................................... 8

*Other*

*Antitrust Compliance Program*, America's Credit Unions (Jan. 2025) ................ 12

Association of American Railroads, *Rail Transportation and the U.S.
     Economy: Fueling Growth, Trade, and Opportunity* (Feb. 28, 2025) ............... 9

CF Indus. Holdings, Inc., *Antitrust Policy and Guide* (June 2020) ...................... 11

David Gow, *Heineken and Grolsch Fined for Price-Fixing*, The Guardian
     (Apr. 18, 2007) ................................................................. 13

Kodiak Gas Services, Inc., *Antitrust Compliance Policy* 8 (June 2023) ............... 12

Christopher R. Leslie, *How to Hide a Price-Fixing Conspiracy: Denial,
     Deception, and Destruction of Evidence*,
     2021 U. Ill. L. Rev. 1199 (Aug. 10, 2021) ...................................... 13

Letter from the Attorneys General of Tennessee, Kansas, Florida,
     Mississippi, Iowa, Montana, North Dakota, South Dakota, and Ohio, to
     the Honorable Patrick Fuchs, Michelle Schultz, and Karen Hedlund,
     Surface Transportation Board (Nov. 14, 2025) (Docket No. FD_38873) ......... 10

Press Release, Dep't of Just., *Justice Department and the FTC Update
     Guidance that Reinforces Parties' Preservation Obligations for
     Collaboration Tools and Ephemeral Messaging* (Jan. 26, 2024) ..................... 13

Press Release, *Eur. Comm'n, Antitrust: Commission Imposes €169 Million
     Fine on Freight Forwarders for Operating Four Price Fixing Cartels*
     (Mar. 28, 2012) ........................................................... 12, 13

Press Release, Surface Transportation Board, *STB Receives Notice of Intent
     for Proposed Merger of Union Pacific and Norfolk Southern*
     (July 30, 2025) ............................................................... 10

The International Council of Shopping Centers, Inc.,
     *Antitrust Policy* (Sep. 2021) ............................................. 11, 12

# GLOSSARY

DOJ               United States Department of Justice

# INTRODUCTION AND INTEREST OF AMICI CURIAE

The Amici States—the District of Columbia, Arizona, Colorado, Connecticut, Delaware, Illinois, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Vermont, and Washington—have long played an essential role in antitrust enforcement. States frequently litigate antitrust claims both alongside federal agencies and in their own local courts. That is by design. For example, Congress has expressly authorized state Attorneys General to bring federal antitrust actions to protect their citizens from the harmful effects of anticompetitive conduct. 15 U.S.C. § 15c. As a result, state Attorneys General, along with the U.S. Department of Justice (DOJ) and the Federal Trade Commission, are the primary enforcers of federal antitrust laws.

Amici States also curb anticompetitive conduct using their respective state antitrust statutes. The majority of those statutes are patterned after federal antitrust laws and state courts often look to federal decisions construing those statutes for guidance in interpreting their own state antitrust laws, sometimes because those very statutes instruct them to do so. As such, Amici States have an interest in ensuring that federal antitrust laws are interpreted sensibly and in accordance with sound antitrust policy.

At a time when proving conspiracies is already challenging—since sophisticated companies rarely reduce their anticompetitive agreements to writing—the district court's approach threatens to make antitrust enforcement even more difficult. In its opinion, the district court erroneously raised the summary judgment standard by requiring plaintiffs to establish that defendants' pricing decisions were "unusual" and to proffer evidence that makes an inference of conspiracy more "attractive" than the alternative. Under long-standing precedent, however, plaintiffs like the appellants need show evidence only of (a) parallel conduct, and (b) "plus factors" that would allow a jury to reasonably infer an anticompetitive agreement. Imposing a heightened standard threatens to undermine Amici States' ability to combat collusive pricing, and this Court should expressly reject the view that antitrust litigants need to meet a higher bar than ordinary plaintiffs at summary judgment.

## SUMMARY OF ARGUMENT

1. Because states serve as enforcers of both federal antitrust laws and analogous state laws, Amici States have a strong interest in the development of sound federal antitrust law. States have historically relied on antitrust laws to combat price-fixing schemes across essential industries like agriculture, housing, and healthcare. Given the importance of antitrust law to Amici States and their residents, it is vitally important that courts apply the correct summary judgment

standard to antitrust cases involving alleged price-fixing conspiracies. If this Court were to adopt the same elevated summary judgment standard employed by the district court, it could have a serious and negative effect on antitrust enforcement more broadly.

This case is important for another reason: rail freight is a critical industry that has an economic impact on nearly all states and drives business activity across multiple industries. And because railroads primarily own and operate their shared infrastructure, states and industries must rely on private freight rail companies to transport essential goods. As such, Amici States have a significant interest in ensuring that antitrust laws do not arbitrarily shield this industry.

Due to expanded efforts by market participants to evade detection, the need to maintain the longstanding flexible standard for conspiracy claims is ever more pressing. Modern businesses are sophisticated and rarely memorialize their collusive practices in writing. Indeed, employees are expressly counseled against it by corporate antitrust policies. Businesses have also been known to use code names and symbols to conceal collusive conduct. And developments in modern technology have only exacerbated this problem and raised the risk of evading enforcement. In fact, the head of the DOJ Antitrust Division recently cautioned that companies are conducting business through ephemeral messaging applications that automatically and irretrievably delete messages. The upshot is that unlawful coordination on price

or non-price terms is increasingly difficult to prove. As a result, government enforcers and private plaintiffs must increasingly rely on circumstantial evidence to prove their cases. Faced with growing consolidation across vital industries and expanded efforts to evade detection, enforcers are at a pivotal moment in antitrust policy. Maintaining the correct summary judgment standard is crucial to enforcement efforts.

2. This Court should avoid adopting the heightened standard that the district court employed because it erred in at least two respects. *First*, the court improperly required plaintiffs to establish that the defendants' pricing decisions were "unusual" in addition to being parallel. This either impermissibly inflates the standard for proving parallel conduct (which simply requires parallelism) or creates a rigid "plus factor" that would need to be present in every conspiracy case based on circumstantial evidence. Such a standard contravenes the flexible inquiry adopted by other circuits and raises the evidentiary bar so high that many antitrust violators could easily slide under it.

*Second*, the district court also erroneously raised the bar for antitrust plaintiffs by requiring them to affirmatively disprove the defendants' theory of the case by proffering more "attractive" evidence of a conspiracy. This approach imposes an unnecessary hurdle that conflicts with controlling Supreme Court precedent, which has long made clear that there is no "special burden on plaintiffs facing summary

judgment in antitrust cases." *Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451, 468 (1992). Under *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574 (1986), plaintiffs must only come forward with more persuasive evidence of coordination if their claims make no economic sense. *Id.* at 587. If the claims are economically plausible, "*Matsushita* does not create any presumption in favor of summary judgment for the defendant." *Eastman Kodak* at 478. Yet the district court erroneously imposed one anyway, deviating from the correct sliding-scale standard.

This Court should clarify that plaintiffs need not show unusual pricing decisions so long as other plus factors have been satisfactorily shown and that the appropriate analysis requires a more flexible, sliding-scale approach based on the economic plausibility of the plaintiff's theory. This approach remains true to the teachings of *Matsushita* and *Eastman Kodak*, reconciles the demands of Federal Rule of Civil Procedure 56 with the policy interests of the courts and defendants in weeding out implausible antitrust claims, and allows states the necessary flexibility to enforce antitrust laws.

# ARGUMENT

## I. States Rely On Antitrust Laws To Address Anticompetitive Price Fixing And Safeguard Consumers.

### A. States play an important role in enforcing federal and state antitrust laws and have a vested interest in fair prices for freight rail services.

1. Amici States protect their residents from unfair and anticompetitive conduct by enforcing both federal and state antitrust statutes. At the federal level, Congress has authorized state Attorneys General to bring federal antitrust actions to protect their residents from anticompetitive conduct—including an ability to seek damages for individuals that even federal antitrust authorities lack. 15 U.S.C. § 15c; *see Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 447 (1945). With the passage of the bipartisan State Antitrust Enforcement Venue Act of 2021, Congress also limited the transfer and consolidation of antitrust cases brought by state Attorneys General, allowing those cases to remain in the court in which they were filed. *See* 28 U.S.C. § 1407(g). As a result, states now operate on equal footing with federal enforcers in deciding where, when, and how to prosecute cases.

Consistent with this authorization, states serve as some of the primary enforcers of federal antitrust laws, devoting significant time and energy to combatting price-fixing schemes across essential industries. Several states, for instance, jointly filed a civil antitrust action with DOJ against Agri Stats, Inc. for taking anticompetitive actions that raised the price of meat. Agri Stats had collected

and distributed price, cost, and output information among meat processors, which ultimately resulted in raised prices and reduced supply, harming our consumers. *See United States v. Agri Stats, Inc.*, No. 0:23-cv-03009 (D. Minn. filed Sept. 28, 2023).

Similarly, in the housing rental industry, several states and DOJ have sued RealPage, Inc., alleging that RealPage facilitated the information exchange of nonpublic competitively sensitive information about rental pricing—which resulted in increased rents for *millions* of Americans. *See United States. v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. filed Aug. 23, 2024).[1] Many states have also taken action to combat price inflation by drug manufacturers and pharmacy benefit managers. *See, e.g.*, *Connecticut v. Sandoz*, No. 20-cv-3539 (E.D. Pa. filed June 10, 2020); MDL 2724 (E.D. Pa.); *Michigan v. Express Scripts, Inc.*, No. 2:25-cv-11215 (E.D. Mich. filed Apr. 28, 2025).

States also use their own local laws to combat anticompetitive conduct. Importantly, many of these state antitrust statutes either mirror or are substantially analogous to their federal counterparts. *See, e.g.*, *District of Columbia v. Amazon.com, Inc.*, 320 A.3d 1073, 1079 (D.C. 2024) (noting that provisions of the

---

[1]   Some states also brought their own actions against RealPage under their respective antitrust laws. *See, e.g.*, *District of Columbia v. RealPage, Inc.*, No. 2023-CAB-006762 (D.C. Super. Ct. filed Nov. 11, 2023); *Maryland v. RealPage, Inc.*, No. C-24-CV-25-003948 (Balt. City Cir. Ct., Md., filed Jan. 15, 2025); *Platkin. v. RealPage, Inc.*, No. 2:25-cv-03057 (D.N.J. filed Apr. 23, 2025).

District of Columbia Antitrust Act "mirror sections 1 and 2 of the federal Sherman Antitrust Act"); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (noting that California's antitrust law "was modeled after the Sherman Act."); *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 392 F. Supp. 2d 118, 143 (D.P.R. 2005) ("Puerto Rico's antitrust laws . . . mirror the federal antitrust statutes."); *BanxCorp v. Bankrate Inc.*, No. 07-cv-3398, 2012 WL 3133786, at *16 (D.N.J. July 30, 2012) ("[T]he language of the relevant portions of the New Jersey Antitrust Act is virtually identical to that of the Sherman Antitrust Act.").[2]

As a result, federal courts' interpretations of federal antitrust law significantly influence state courts' interpretations of state antitrust law. Indeed, in interpreting the District of Columbia Antitrust Act, courts are expressly permitted by statute to "use as a guide interpretations given by federal courts to comparable antitrust statutes." D.C. Code § 28-4515; *see also, e.g.*, N.H. Rev. Stat. Ann. § 356:14 ("[T]he

---

[2]     *See also In re Elec. Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 2535112, at *18 (S.D.N.Y. June 5, 2014) ("In relevant part, the [Wisconsin Antitrust Act] parallels Section 1 of the Sherman Act[.]"); *Caller-Times Publ'g Co., Inc. v. Triad Commc'ns Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) ("The current Texas Antitrust Act is modeled on both the Sherman Antitrust Act and the Clayton Act."); *State v. Black*, 676 P.2d 963, 967 (Wash. 1984) (en banc) ("The act is patterned to a large extent after federal trade regulation statutes. [The provision] prohibiting contracts or conspiracies in restraint of trade is our State's equivalent of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1[.]"); *Trane U.S. Inc. v. Meehan*, 563 F. Supp. 2d 743, 758 (N.D. Ohio 2008) ("The statutes commonly known as the Valentine Act 'were patterned after the Sherman Antitrust Act[.]'").

courts may be guided by interpretations of the United States' antitrust laws."); Tex. Bus. & Com. Code § 15.04 (similar); *St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 65 n.2 (3d Cir. 2009) (citing N.J. Stat. Ann. § 56:9-18) (similar); *Sonora Cmty. Hosp.*, 236 F.3d at 1160 (analyzing California's antitrust statute) (similar); *Anheuser Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1988) (similar); *Black*, 676 P.2d at 967 (similar).

Because states serve as enforcers of both federal antitrust laws and analogous state laws, Amici States have a strong interest in the development of federal antitrust law. The district court's reasoning, if adopted by this Court, could erroneously impose a heightened standard for summary judgment in antitrust conspiracy cases. That would harm consumers and states alike, and the Court should fastidiously avoid adopting an approach that would put enforcers at a disadvantage.

2. Amici States also have vested interest in fair pricing for freight rail services. Fair shipping prices are vitally important to consumers and private-sector businesses—and hence to states as antitrust enforcers—and also to states as consumers of goods. According to the Association of American Railroads, "[t]he economic impact of freight rail extends across . . . 49 states with freight rail operations." Association of American Railroads, *Rail Transportation and the U.S. Economy: Fueling Growth, Trade, and Opportunity* 20 (Feb. 28, 2025), https://perma.cc/S4TU-9U5H. Railroads transport approximately 1.6 billion tons of

goods annually, driving business activity across multiple industries. *Id*. at 12. In 2023, rail transportation generated approximately $233.4 billion in total economic output. *Id*. at 3, 17-19. Railroads are also unique in that they "primarily operate on infrastructure they own, build, and maintain themselves." *Id*. at 16. As a result, states and industries must rely on private freight rail companies to transport essential goods. Amici States therefore have a strong interest in preserving the ability to combat anticompetitive conduct by major freight railroads.

Increasing consolidation in the freight rail industry has only heightened this interest. When the Surface Transportation Board recently announced a proposed merger between Union Pacific Railroad Company and Norfolk Southern Railway Company—two of the Defendants in this litigation—a number of states expressed concern. *See* Press Release, Surface Transportation Board, *STB Receives Notice of Intent for Proposed Merger of Union Pacific and Norfolk Southern* (July 30, 2025), https://perma.cc/42GX-VCP3; Letter from the Attorneys General of Tennessee, Kansas, Florida, Mississippi, Iowa, Montana, North Dakota, South Dakota, and Ohio, to the Honorable Patrick Fuchs, Michelle Schultz, and Karen Hedlund, Surface Transportation Board, at 1 (Nov. 14, 2025) [hereinafter "Tenn. A.G. Letter"] (on file with the Surface Transportation Board, Docket No. FD_36873). The states worried that further consolidation would "result in undue market concentration that stifles competition and therefore creates higher prices" for consumers and states

alike.  Tenn. A.G. Letter at 1.  The states observed that "as the railroads have consolidated, many shippers have seen rail service suffer while costs have increased dramatically."  *Id*.  Incentivizing additional anticompetitive conduct in the rail industry would only compound the harms of consolidation.

Given the increasing consolidation in this vital industry that states and their residents heavily rely on, Amici States have a significant interest in ensuring the antitrust laws protect their residents from anticompetitive practices in freight rail in particular.

**B.    Due to increasing efforts by market participants to evade detection, states often rely on circumstantial evidence to prove concerted action.**

Although states have devoted extensive resources to combatting price-fixing conspiracies, efforts by sophisticated market participants to evade detection continue to present challenges—challenges that could be worsened by the district court's approach.    Businesses are increasingly becoming adept at concealing their anticompetitive conduct.  Modern corporate antitrust compliance policies expressly counsel employees against capturing meetings, negotiations, and other discussions in writing.  For example, one company advises its employees to write every document "with the assumption that on some future date, it will be produced for inspection by antitrust enforcement authorities or treble-damage plaintiffs who will tend to interpret any language in the worst light possible."  CF Indus. Holdings, Inc.,

*Antitrust Policy and Guide* 17 (June 2020), https://perma.cc/BF2Z-TWT3. The policy even includes a list of certain antitrust phrases to avoid using such as "dominant position," "price leader," or "industry agreement." *Id*. at 18. Other companies have adopted similar guidance. *See, e.g.*, The International Council of Shopping Centers, Inc., *Antitrust Policy* (Sep. 2021), https://www.icsc.com/antitrust-policy (counseling against language like "dominate" or "lock our competitors"); Kodiak Gas Services, Inc., *Antitrust Compliance Policy* 8 (June 2023), https://bit.ly/3YnulMq ("When communicating in written form, be careful to avoid any of the following: a. Using 'guilt-ridden' words or terms such as, 'Please destroy after reading.' b. Speculating as to the legal propriety or consequences of conduct. c. Using power phrases such as, 'We will dominate the market,' or 'We will kill the competition.'"); *Antitrust Compliance Program*, America's Credit Unions (Jan. 2025), https://perma.cc/J57A-QDUA (instructing its employees not to "commit to writing anything that [they] would not be comfortable repeating or explaining to a government investigator, judge, or jury").

Businesses have also been known to use code names and symbols designed to conceal collusive conduct, effectively frustrating attempts to comprehend anticompetitive communications should they ever be discovered. *See, e.g.*, *In re Automotive Parts Antitrust Litigation*, No. 12-MD-02311, 2014 WL 4272772, at *13 (E.D. Mich. Aug. 29, 2014) ("[T]he Court is aware that in their pleas [several

Defendants] admitted to using code names and meeting at remote locations" to conceal their price-fixing conduct for automotive wire harness systems.); Press Release, Eur. Comm'n, *Antitrust: Commission Imposes €169 Million Fine on Freight Forwarders for Operating Four Price Fixing Cartels* (Mar. 28, 2012), https://perma.cc/EZ3A-9BES (noting that the participants "organised their contacts in a so-called 'Gardening Club' and code names based on names of vegetables"); David Gow, *Heineken and Grolsch Fined for Price-Fixing*, The Guardian (Apr. 18, 2007), https://perma.cc/34L2-CH59 (noting that brewers fixing prices in the Dutch beer market "tried to cover their tracks by using code names and abbreviations for secret meetings"); Christopher R. Leslie, *How to Hide a Price-Fixing Conspiracy: Denial, Deception, and Destruction of Evidence*, 2021 U. Ill. L. Rev. 1199, 1205-08 (Aug. 10, 2021) (collecting examples).

Developments in modern technology have only exacerbated this problem. Just last year, DOJ warned that "there has been an increase in the use of collaboration tools and ephemeral messaging applications, such as Slack, Microsoft Teams and Signal" that are "designed to hide evidence." Press Release, Dep't of Just., *Justice Department and the FTC Update Guidance that Reinforces Parties' Preservation Obligations for Collaboration Tools and Ephemeral Messaging* (Jan. 26, 2024), https://perma.cc/5Z37-PNZY. Similarly, a federal district court recently expressed how it was "taken aback by the lengths to which Google [went] to avoid creating a

paper trail for [antitrust] regulators and litigants" by "train[ing] its employees, rather effectively, not to create 'bad' evidence." *United States v. Google LLC*, 747 F. Supp. 3d 1, 187 (D.D.C. 2024). Google had a "long-time practice" of "deleting chat messages among Google employees after 24 hours, unless the default setting is turned to 'history on.'" *Id*. at 185-86. Due to these practices, as well as internal guidance on avoiding antitrust buzzwords, the court remarked that "[i]t is no wonder then that this case has lacked the kind of nakedly anticompetitive communications seen in" earlier antitrust cases. *Id*. at 187.

In light of companies' increasing sophistication, there will often be little, if any, direct evidence of existing anticompetitive conspiracies. Indeed, an antitrust conspiracy "usually is proved by inference and suspicion." *Multiflex, Inc. v. Samuel Moore & Co*., 709 F.2d 980, 988 (5th Cir. 1983). States and other plaintiffs increasingly must rely instead on circumstantial evidence to prove concerted action. Given these challenges, in Amici States' view, the standard that courts apply to circumstantial evidence cases is crucial. If an antitrust enforcer or private plaintiff cannot rely on circumstantial evidence—and the reasonable inferences that can be drawn from such evidence—to carry them beyond the summary judgment stage, price-fixing conspiracies will rarely be successfully challenged or prosecuted. Amici States therefore have a significant interest in guarding against unduly burdensome standards in this Court and others.

## II. The District Court's Decision Is Incorrect And Threatens To Undermine Antitrust Enforcement Efforts.

The district court in this case ratcheted up the standard that antitrust plaintiffs are required to meet in a price-fixing conspiracy case—and, if adopted by this Court, that approach could undermine efforts to hold conspirators liable. The district court erred in at least two respects in articulating the standard of proof that plaintiffs must meet to avoid summary judgment. First, as to parallel conduct, the court improperly required plaintiffs to establish "pricing decisions so 'unusual . . .' [that] they could not be expected from an ordinary competitive market." Op. 48, *as reprinted in In re Rail Freight Fuel Surcharge Antitrust Litig. (No. I)*, No. 11-CV-1049, 2025 WL 1784519, at *21 (D.D.C. June 27, 2025). That is not the law. Conspiracy plaintiffs may show conspiracy by first showing parallel conduct and then showing one or more "plus factors." While unusual pricing may be such a plus factor, it is not a required one. Second, the court erroneously required that even after parallel conduct is shown, the "evidence must make the inference of a conspiracy more 'attractive' than the alternative inference of independent action." Op. 35. This too is not the law. Instead, to overcome summary judgment, plaintiffs need only put forth sufficient evidence to make an inference of conspiracy "reasonable." The district court's holdings create a special standard of proof for indirect-evidence antitrust cases that conflicts with well-established Supreme Court precedent.

1. To begin, the district court missed the mark when it required plaintiffs to prove that the defendants' pricing decisions were "unusual" in addition to being parallel. Op. 48. (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 135 (3d Cir. 1999)). This Court should avoid raising the bar on what is ordinarily not an onerous inquiry: namely, the initial hurdle of demonstrating parallel conduct. To be sure, parallel conduct "does not, *standing alone*" always "support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588 (emphasis added). Instead, there must be some other "plus factor[]" that would allow a jury to infer an agreement among competitors. *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 360 (3d Cir. 2004). But importantly, "[t]here is no finite set of" plus factors and "no exhaustive list exists" as to which factors are required to survive summary judgment. *Id.* (citing cases). Instead, any plus factor must simply nudge the inference of an agreement across the line from a coin-toss to something slightly more, so that a reasonable juror could find an agreement more probable than not.

Requiring pricing decisions to be "so 'unusual . . .' [that] they could not be expected from an ordinary competitive market," Op. 48, either impermissibly inflates the standard for proving parallel conduct (which simply requires sufficient similarity in pricing or other behavior) or creates a rigid "plus factor" that would need to be present in every case. That approach would contravene the more flexible inquiry adopted by most circuits. *See* 14 Phillip E. Areeda & Herbert Hovenkamp,

*Antitrust Law: An Analysis of Antitrust Principles and their Application* (CCH) ¶ 1434a n.1 (noting that "the Supreme Court has not recounted a list of plus factors" and that "numerous plus factors … have been considered by other circuits"). It would also raise the evidentiary bar so high that many antitrust violators could easily slide under it, as the nature of collusive pricing is not particularly "unusual" and may appear consistent with marketplace conditions. As such, the district court erroneously placed too much weight on plaintiffs' purported failure to demonstrate extremely unusual pricing decisions.

The district court relied on a single sentence in an out-of-circuit case—*In re Baby Food*—to generate the requirement that pricing decisions be "unusual." But as the district court itself recognized in a footnote, *In re Baby Food* demanded "unusual" pricing in the context of establishing a "plus factor," not as a baseline for showing parallel conduct. Op. 43 n.10. Specifically, the *Baby Food* court reviewed whether plaintiffs, principally via their expert, had established the "motive to conspire" plus factor by suggesting that competitors followed each other's price increases and would not have done so absent a cartel. The court concluded that "meet[ing] rival prices" did not show that the prices imposed were so unusually against self-interest that no reasonable firm would have engaged in such pricing absent agreement. *Baby Food*, 166 F.3d at 135. The point was thus a modest, particularized one: in assessing whether a plaintiff establishes "motive to conspire"

as a plus factor, standard oligopoly pricing alone cannot carry the day. If, as the district court here appears to suggest, the Third Circuit meant to require "unusual" pricing beyond matching rivals to survive summary judgment in any conspiracy case, that is simply incorrect. But the Third Circuit did not treat unusual pricing as a baseline for parallel conduct, nor as a hard-and-fast prerequisite for a pricing conspiracy.

Reinforcing the point, that is not how the Third Circuit has interpreted *Baby Food* in subsequent cases. In *In Re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015), for example, the Third Circuit referenced "unusual" pricing in the context of establishing a different "plus factor"—specifically, whether the defendants "acted contrary to their self-interest." *Id*. at 399-400. In another Third Circuit opinion, *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185 (3d Cir. 2017), the court treated unusual pricing as a separate, standalone path to prove conspiracy based on parallel behavior. *Id*. at 193. The Court explained that the conspiracy "analysis often begins with evidence of parallel price movements," which can certainly be shown through "proof of parallel behavior" that is "so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it." *Id*. (internal quotation marks omitted). But "[b]ecause proof of parallel behavior will rarely itself create an inference of conspiracy, a plaintiff will often need to 'show that certain plus factors are present' in order '[t]o move the ball across

the goal line.'" *Id.* (quoting *Chocolate*, 801 F.3d at 398-99); *see id.* at 196 ("Having found that the pattern of parallel price increases does not raise an inference of conspiracy, we next turn to [plaintiff's] argument that the plus factors evidence a conspiracy."). Even in the Third Circuit, "unusual" pricing is not necessary to survive summary judgment—it is merely one factor that, when combined with parallel conduct, can be sufficient. This Court should not treat unusual pricing as a prerequisite either.

2. Separately, the district court erroneously raised the bar for antitrust plaintiffs by insisting that "evidence must make the inference of a conspiracy more 'attractive' than the alternative inference of independent action." Op. 35. That approach conflicts with controlling Supreme Court precedent and imposes an unnecessary hurdle prior to trial. For example, in *Matsushita*, the Supreme Court addressed the standard of proof necessary to survive summary judgment in a Section 1 case relying on indirect evidence. It held that plaintiffs need only proffer "evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." 474 U.S. at 588. Specifically, to reach the jury, plaintiffs need only "show that the inference of conspiracy is *reasonable* in light of the competing inferences" of independent or collusive action. *Id.* (emphasis added). Importantly, and as the district court already acknowledged, "[t]his requirement does not establish

a 'special burden' on plaintiffs in antitrust cases." Op. 36 (quoting *Eastman Kodak Co.*, 504 U.S. at 468).

Although professing to rely on *Matsushita*, the district court misconstrued its teachings. In *Matsushita*, the Court explained that plaintiffs "must come forward with more persuasive evidence to support their claim than would otherwise be necessary" only if "the claim is one that simply makes no economic sense." *Matsushita*, 475 U.S. at 587; *see Eastman Kodak*, 504 U.S. at 468 (explaining that because "plaintiffs' theory of predatory pricing made no practical sense, . . . summary judgment would be appropriate against them unless they came forward with more persuasive evidence to support their theory"). In other words, if plaintiffs' claims are economically plausible, "*Matsushita* does not create any presumption in favor of summary judgment for the defendant." *Id*. at 478.

The Third Circuit's reasoning in *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993) is instructive on this point. There, the Third Circuit compared the plausibility of the market allocation and bid rigging claims in that case with the predatory pricing claim in *Matsushita*. The court identified "two important circumstances underlying" *Matsushita*: (1) "the plaintiffs' theory of conspiracy was implausible"; and (2) "permitting an inference of antitrust conspiracy in the circumstances [there] would have [had] the effect of deterring significant procompetitive conduct." *Id*. at 1232 (internal quotation marks omitted).

Because the claims in *Petruzzi's* made "perfect economic sense" and defendants' conduct could not reasonably be perceived as procompetitive, the Third Circuit concluded that "more liberal inferences from the evidence should be permitted than in *Matsushita* because the attendant dangers from drawing inferences recognized in *Matsushita* are not present." *Id.*; *see InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 165-66 (3d Cir. 2003) ("[T]he acceptable inferences which can be drawn from circumstantial evidence vary with the plausibility of the plaintiff's theory and the dangers associated with such theories." (quoting *Petruzzi's*, 998 F.2d at 1232)); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1001 (3d Cir. 1994) ("[T]he meaning we ascribe to circumstantial evidence will vary depending upon the challenged conduct."); *accord In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) ("By contrast, broader inferences are permitted, and the 'tends to exclude' standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and 'the challenged activities could not reasonably be perceived as procompetitive.'" (quoting *Flat Glass,* 385 F.3d at 358)); *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 319 (6th Cir. 2015) (same).

Similarly, this case involves allegations of horizontal price-fixing, a *per se* violation of the antitrust laws. Unlike the claims of predatory pricing in *Matsushita*, the plaintiffs' theory of this case below—that defendants agreed to raise overall

prices by imposing consistently high, near-identical fuel surcharges—made economic sense for the defendants.  Absent an agreement, no defendant would have been able to raise its freight prices without risking the loss of its business to the other three major freight companies.  Yet if all defendants *agreed* to raise their freight prices simultaneously through the imposition of a neutral-sounding "fuel surcharge," then each could pocket more profits without incurring a competitive disadvantage. In such a scenario, it is the job of a jury—not a court at summary judgment—to weigh all the evidence and determine whether this theory was "more attractive" than defendants' theory of conscious parallelism.

As such, in this context, there was no basis for the district court to require plaintiffs to proffer "more attractive" evidence and affirmatively disprove the defendants' theory of the case.  *See, e.g.*, *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 94 F.3d 1032, 1036 (6th Cir. 1996) (distinguishing the price-fixing allegation there from *Matsushita* by calling it the "classic anti-trust situation: an attempt to avoid a competitive marketplace by setting prices at an artificially high level"); *In re Brand Name Prescription Drugs Litig.*, 123 F.3d 599, 613-14 (7th Cir. 1997) (holding that summary judgment for defendant drug manufacturers and wholesalers was inappropriate where drug retailer plaintiffs' theory that defendants conspired to fix prices was plausible and supported by some evidence, although defendants

offered innocent interpretations for the evidence), *cert. denied sub nom.*, *Abbott Lab'ys v. Higgins*, 522 U.S. 1153 (1998).

The district court's reliance on *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n*, 663 F.2d 253 (D.C. Cir. 1981), as support for this heightened standard is also misplaced. As appellants explain, Appellant Br. 34-35, *Federal Prescription* involved appellate review of a bench trial decision, not summary judgment, and considered whether state regulators were actively conspiring with market participants—a far cry from horizontal price-fixing wholly among private actors. In that context, post-trial, there simply was not enough evidence to show an agreement between regulators and the defendants. *Fed. Prescription Serv. Inc.*, 663 F.2d at 267. The question in this case, unlike *Federal Prescription*, is simply whether the plaintiffs can get their case before a jury. Plaintiffs' evidence does not have to be especially "attractive" to surmount the summary judgment bar. In addition, *Federal Prescription* was decided several years before *Matsushita* and *Eastman Kodak*, which make clear that "*Matsushita* demands only that the nonmoving party's inferences be *reasonable* in order to reach the jury"—not that they must be especially compelling. *Eastman Kodak*, 504 U.S. at 468 (emphasis added); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (evidence need only "*reasonably* tend[] to prove that the [defendants] had a conscious

commitment to a common scheme designed to achieve an unlawful objective" (emphasis added) (internal quotation marks omitted)).

For these reasons, Amici States urge the Court to reverse the district court's decision. At a minimum, this Court should clarify that plaintiffs need not show "unusual" pricing decisions so long as they adduce sufficient evidence of parallel conduct and satisfactory plus factors. This Court should also clarify that the appropriate analysis is exemplified by a more flexible, sliding-scale approach. *See, e.g.*, *Petruzzi's*, 998 F.2d at 1231-33; *In re Flat Glass*, 385 F.3d at 358-59; *InterVest*, 340 F.3d at 165-66; *Alvord-Polk*, 37 F.3d at 1001. For example, when a plaintiff's economic theory is entirely plausible and poses little danger to procompetitive conduct, the evidence of a conspiracy need not be unusually strong. More is required only when plaintiffs' theory is inherently implausible or problematic. This approach remains true to the teachings of *Matsushita* and *Kodak*. It also reconciles the demands of Federal Rule of Civil Procedure 56 and the policy interests of courts and defendants in rooting out implausible antitrust claims early in the judicial process. Doing otherwise risks hamstringing civil enforcement actions against harmful price-fixing conspiracies under the Sherman Act and state antitrust laws.

# CONCLUSION

For the foregoing reasons, this Court should reverse the district court's decision.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

/s/ Amber Greenaway
AMBER GREENAWAY
Assistant Attorney General
Bar Number 64893
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-5528
December 2025                amber.greenaway@dc.gov

On behalf of:

KRISTIN K. MAYES
*Attorney General*
State of Arizona

PHILIP J. WEISER
*Attorney General*
State of Colorado

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

KWAME RAOUL
*Attorney General*
State of Illinois

KRIS W. KOBACH
*Attorney General*
State of Kansas

AARON M. FREY
*Attorney General*
State of Maine

ANTHONY G. BROWN
*Attorney General*
State of Maryland

ANDREA JOY CAMPBELL
*Attorney General*
Commonwealth of Massachusetts

DANA NESSEL
*Attorney General*
State of Michigan

KEITH ELLISON
*Attorney General*
State of Minnesota

AARON D. FORD
*Attorney General*
State of Nevada

MATTHEW J. PLATKIN
*Attorney General*
State of New Jersey

RAÚL TORREZ
*Attorney General*
State of New Mexico

DAN RAYFIELD
*Attorney General*
State of Oregon

DAVID W. SUNDAY, JR.
*Attorney General*
Commonwealth of Pennsylvania

PETER F. NERONHA
*Attorney General*
State of Rhode Island

JONATHAN SKRMETTI
*Attorney General*
State of Tennessee

KEN PAXTON
*Attorney General*
State of Texas

DEREK BROWN
*Attorney General*
State of Utah

CHARITY R. CLARK
*Attorney General*
State of Vermont

NICHOLAS W. BROWN
*Attorney General*
State of Washington

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 29(a) because the brief contains 5,524 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Amber D. Greenaway
AMBER D. GREENAWAY